# BOY SCOUTS OF AMERICA ET AL. *v.* DALE

No. 99–699.   Argued April 26, 2000—Decided June 28, 2000

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 663. SOUTER, J., filed a dissenting opinion, in which GINSBURG and BREYER, JJ., joined, *post*, p. 700.

*George A. Davidson* argued the cause for petitioners. With him on the briefs were *Carla A. Kerr, David K. Park, Michael W. McConnell,* and *Sanford D. Brown.*

*Evan Wolfson* argued the cause for respondent. With him on the brief were *Ruth E. Harlow, David Buckel, Jon W. Davidson, Beatrice Dohrn, Patricia M. Logue, Thomas J. Moloney, Allyson W. Haynes,* and *Lewis H. Robertson.**

---

*Briefs of *amici curiae* urging reversal were filed for Agudath Israel of America by *David Zwiebel;* for the American Center for Law and Justice et al. by *Jay Alan Sekulow, Vincent McCarthy, John P. Tuskey,* and *Laura B. Hernandez;* for the American Civil Rights Union by *Peter J. Ferrara;* for the Becket Fund for Religious Liberty by *Kevin J. Hasson* and *Eric W. Treene;* for the California State Club Association et al. by *William I. Edlund;* for the Center for the Original Intent of the Constitution by *Michael P. Farris;* for the Christian Legal Society et al. by *Kimberlee Wood Colby* and *Carl H. Esbeck;* for the Claremont Institute Center

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioners are the Boy Scouts of America and the Monmouth Council, a division of the Boy Scouts of America (col-

for Constitutional Jurisprudence by *Edwin Meese III;* for the Eagle Forum Education & Legal Defense Fund et al. by *Erik S. Jaffe;* for the Family Defense Council et al. by *William E. Fay III;* for the Family Research Council by *Janet M. LaRue;* for Gays and Lesbians for Individual Liberty by *William H. Mellor, Clint Bolick,* and *Scott G. Bullock;* for the Individual Rights Foundation by *Paul A. Hoffman* and *Patrick J. Manshardt;* for the Institute for Public Affairs of the Union of Orthodox Jewish Congregations of America by *Nathan J. Diament;* for the Liberty Legal Institute by *Kelly Shackelford* and *George B. Flint;* for the National Catholic Committee on Scouting et al. by *Von G. Keetch;* for the National Legal Foundation by *Barry C. Hodge;* for the Pacific Legal Foundation by *John H. Findley;* for Public Advocate of the United States et al. by *William J. Olson* and *John S. Miles;* for the United States Catholic Conference et al. by *Mark E. Chopko* and *Jeffrey Hunter Moon;* and for John J. Hurley et al. by *Chester Darling, Michael Williams,* and *Dwight G. Duncan.*

Briefs of *amici curiae* urging affirmance were filed for the State of New Jersey by *John J. Farmer, Jr.,* Attorney General, *Jeffrey Burstein,* Senior Deputy Attorney General, and *Charles S. Cohen,* Deputy Attorney General; for the State of New York et al. by *Eliot Spitzer,* Attorney General of New York, *Preeta D. Bansal,* Solicitor General, and *Adam L. Aronson,* Assistant Solicitor General, and by the Attorneys General for their respective States as follows: *Bill Lockyer* of California, *Earl I. Anzai* of Hawaii, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Philip T. McLaughlin* of New Hampshire, *W. A. Drew Edmondson* of Oklahoma; *Hardy Myers* of Oregon, *William H. Sorrell* of Vermont, and *Christine O. Gregoire* of Washington; for the city of Atlanta et al. by *Peter T. Barbur, Sara M. Darehshori, James K. Hahn, David I. Schulman, Jeffrey L. Rogers, Madelyn F. Wessel, Thomas J. Berning, Lawrence E. Rosenthal, Benna Ruth Solomon, Michael D. Hess, Leonard J. Koerner, Florence A. Hutner,* and *Louise Renne;* for the American Association of School Administrators et al. by *Mitchell A. Karlan;* for the American Bar Association by *William G. Paul* and *Robert H. Murphy;* for the American Civil Liberties Union et al. by *Matthew A. Coles, Steven R. Shapiro, Sara L. Mandelbaum,* and *Lenora M. Lapidus;* for the American Jewish Congress by *Marc D. Stern;* for the American Psychological Association by *Paul M. Smith, Nory Miller, James L. McHugh,* and *Nathalie F. P. Gil-*

lectively, Boy Scouts). The Boy Scouts is a private, not-for-profit organization engaged in instilling its system of values in young people. The Boy Scouts asserts that homosexual conduct is inconsistent with the values it seeks to instill. Respondent is James Dale, a former Eagle Scout whose adult membership in the Boy Scouts was revoked when the Boy Scouts learned that he is an avowed homosexual and gay rights activist. The New Jersey Supreme Court held that New Jersey's public accommodations law requires that the Boy Scouts readmit Dale. This case presents the question whether applying New Jersey's public accommodations law in this way violates the Boy Scouts' First Amendment right of expressive association. We hold that it does.

I

James Dale entered Scouting in 1978 at the age of eight by joining Monmouth Council's Cub Scout Pack 142. Dale became a Boy Scout in 1981 and remained a Scout until he turned 18. By all accounts, Dale was an exemplary Scout. In 1988, he achieved the rank of Eagle Scout, one of Scouting's highest honors.

Dale applied for adult membership in the Boy Scouts in 1989. The Boy Scouts approved his application for the position of assistant scoutmaster of Troop 73. Around the same time, Dale left home to attend Rutgers University. After arriving at Rutgers, Dale first acknowledged to himself and

---

*foyle;* for the American Public Health Association et al. by *Marvin E. Frankel, Jeffrey S. Trachtman,* and *Kerri Ann Law;* for Bay Area Lawyers for Individual Freedom et al. by *Edward W. Swanson* and *Paula A. Brantner;* for Deans of Divinity Schools and Rabbinical Institutions by *David A. Schulz;* for the National Association for the Advancement of Colored People by *Dennis C. Hayes* and *David T. Goldberg;* for Parents, Families, and Friends of Lesbians and Gays, Inc., et al. by *John H. Pickering, Daniel H. Squire,* and *Carol J. Banta;* for the Society of American Law Teachers by *Nan D. Hunter* and *David Cole;* and for Roland Pool et al. by *David M. Gische* and *Merril Hirsh.*

*Michael D. Silverman* filed a brief for the General Board of Church and Society of the United Methodist Church et al.

others that he is gay. He quickly became involved with, and eventually became the copresident of, the Rutgers University Lesbian/Gay Alliance. In 1990, Dale attended a seminar addressing the psychological and health needs of lesbian and gay teenagers. A newspaper covering the event interviewed Dale about his advocacy of homosexual teenagers' need for gay role models. In early July 1990, the newspaper published the interview and Dale's photograph over a caption identifying him as the copresident of the Lesbian/Gay Alliance.

Later that month, Dale received a letter from Monmouth Council Executive James Kay revoking his adult membership. Dale wrote to Kay requesting the reason for Monmouth Council's decision. Kay responded by letter that the Boy Scouts "specifically forbid membership to homosexuals." App. 137.

In 1992, Dale filed a complaint against the Boy Scouts in the New Jersey Superior Court. The complaint alleged that the Boy Scouts had violated New Jersey's public accommodations statute and its common law by revoking Dale's membership based solely on his sexual orientation. New Jersey's public accommodations statute prohibits, among other things, discrimination on the basis of sexual orientation in places of public accommodation. N. J. Stat. Ann. §§ 10:5–4 and 10:5–5 (West Supp. 2000); see Appendix, *infra*, at 661–663.

The New Jersey Superior Court's Chancery Division granted summary judgment in favor of the Boy Scouts. The court held that New Jersey's public accommodations law was inapplicable because the Boy Scouts was not a place of public accommodation, and that, alternatively, the Boy Scouts is a distinctly private group exempted from coverage under New Jersey's law. The court rejected Dale's common-law claim, holding that New Jersey's policy is embodied in the public accommodations law. The court also concluded that the Boy Scouts' position in respect of active homosexuality was clear

and held that the First Amendment freedom of expressive association prevented the government from forcing the Boy Scouts to accept Dale as an adult leader.

The New Jersey Superior Court's Appellate Division affirmed the dismissal of Dale's common-law claim, but otherwise reversed and remanded for further proceedings. 308 N. J. Super. 516, 706 A. 2d 270 (1998). It held that New Jersey's public accommodations law applied to the Boy Scouts and that the Boy Scouts violated it. The Appellate Division rejected the Boy Scouts' federal constitutional claims.

The New Jersey Supreme Court affirmed the judgment of the Appellate Division. It held that the Boy Scouts was a place of public accommodation subject to the public accommodations law, that the organization was not exempt from the law under any of its express exceptions, and that the Boy Scouts violated the law by revoking Dale's membership based on his avowed homosexuality. After considering the state-law issues, the court addressed the Boy Scouts' claims that application of the public accommodations law in this case violated its federal constitutional rights "'to enter into and maintain . . . intimate or private relationships . . . [and] to associate for the purpose of engaging in protected speech.'" 160 N. J. 562, 605, 734 A. 2d 1196, 1219 (1999) (quoting *Board of Directors of Rotary Int'l* v. *Rotary Club of Duarte,* 481 U. S. 537, 544 (1987)). With respect to the right to intimate association, the court concluded that the Boy Scouts' "large size, nonselectivity, inclusive rather than exclusive purpose, and practice of inviting or allowing nonmembers to attend meetings, establish that the organization is not 'sufficiently personal or private to warrant constitutional protection' under the freedom of intimate association." 160 N. J., at 608–609, 734 A. 2d, at 1221 (quoting *Duarte, supra,* at 546). With respect to the right of expressive association, the court "agree[d] that Boy Scouts expresses a belief in moral values and uses its activities to encourage the moral development

of its members." 160 N. J., at 613, 734 A. 2d, at 1223. But the court concluded that it was "not persuaded . . . that a shared goal of Boy Scout members is to associate in order to preserve the view that homosexuality is immoral." *Ibid.*, 734 A. 2d, at 1223–1224 (internal quotation marks omitted). Accordingly, the court held "that Dale's membership does not violate the Boy Scouts' right of expressive association because his inclusion would not 'affect in any significant way [the Boy Scouts'] existing members' ability to carry out their various purposes.'" *Id.*, at 615, 734 A. 2d, at 1225 (quoting *Duarte, supra*, at 548). The court also determined that New Jersey has a compelling interest in eliminating "the destructive consequences of discrimination from our society," and that its public accommodations law abridges no more speech than is necessary to accomplish its purpose. 160 N. J., at 619–620, 734 A. 2d, at 1227–1228. Finally, the court addressed the Boy Scouts' reliance on *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557 (1995), in support of its claimed First Amendment right to exclude Dale. The court determined that *Hurley* did not require deciding the case in favor of the Boy Scouts because "the reinstatement of Dale does not compel Boy Scouts to express any message." 160 N. J., at 624, 734 A. 2d, at 1229.

We granted the Boy Scouts' petition for certiorari to determine whether the application of New Jersey's public accommodations law violated the First Amendment. 528 U. S. 1109 (2000).

## II

In *Roberts* v. *United States Jaycees*, 468 U. S. 609, 622 (1984), we observed that "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." This right is crucial in preventing the majority from imposing its views on groups that would

rather express other, perhaps unpopular, ideas. See *ibid.* (stating that protection of the right to expressive association is "especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority"). Government actions that may unconstitutionally burden this freedom may take many forms, one of which is "intrusion into the internal structure or affairs of an association" like a "regulation that forces the group to accept members it does not desire." *Id.,* at 623. Forcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express. Thus, "[f]reedom of association . . . plainly presupposes a freedom not to associate." *Ibid.*

The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints. *New York State Club Assn., Inc.* v. *City of New York,* 487 U. S. 1, 13 (1988). But the freedom of expressive association, like many freedoms, is not absolute. We have held that the freedom could be overridden "by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts, supra,* at 623.

To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in "expressive association." The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private.

Because this is a First Amendment case where the ultimate conclusions of law are virtually inseparable from findings of fact, we are obligated to independently review the

factual record to ensure that the state court's judgment does not unlawfully intrude on free expression. See *Hurley, supra,* at 567–568. The record reveals the following. The Boy Scouts is a private, nonprofit organization. According to its mission statement:

"It is the mission of the Boy Scouts of America to serve others by helping to instill values in young people and, in other ways, to prepare them to make ethical choices over their lifetime in achieving their full potential.

"The values we strive to instill are based on those found in the Scout Oath and Law:

"Scout Oath

"On my honor I will do my best
"To do my duty to God and my country
"and to obey the Scout Law;
"To help other people at all times;
"To keep myself physically strong,
"mentally awake, and morally straight.

"Scout Law

"A Scout is:

| | |
|---|---|
| "Trustworthy | Obedient |
| "Loyal | Cheerful |
| "Helpful | Thrifty |
| "Friendly | Brave |
| "Courteous | Clean |
| "Kind | Reverent." App. 184. |

Thus, the general mission of the Boy Scouts is clear: "[T]o instill values in young people." *Ibid.* The Boy Scouts seeks to instill these values by having its adult leaders spend time with the youth members, instructing and engaging them in activities like camping, archery, and fishing. During the time spent with the youth members, the scoutmasters and assistant scoutmasters inculcate them with the Boy

Scouts' values—both expressly and by example. It seems indisputable that an association that seeks to transmit such a system of values engages in expressive activity. See *Roberts, supra,* at 636 (O'CONNOR, J., concurring) ("Even the training of outdoor survival skills or participation in community service might become expressive when the activity is intended to develop good morals, reverence, patriotism, and a desire for self-improvement").

Given that the Boy Scouts engages in expressive activity, we must determine whether the forced inclusion of Dale as an assistant scoutmaster would significantly affect the Boy Scouts' ability to advocate public or private viewpoints. This inquiry necessarily requires us first to explore, to a limited extent, the nature of the Boy Scouts' view of homosexuality.

The values the Boy Scouts seeks to instill are "based on" those listed in the Scout Oath and Law. App. 184. The Boy Scouts explains that the Scout Oath and Law provide "a positive moral code for living; they are a list of 'do's' rather than 'don'ts.'" Brief for Petitioners 3. The Boy Scouts asserts that homosexual conduct is inconsistent with the values embodied in the Scout Oath and Law, particularly with the values represented by the terms "morally straight" and "clean."

Obviously, the Scout Oath and Law do not expressly mention sexuality or sexual orientation. See *supra,* at 649. And the terms "morally straight" and "clean" are by no means self-defining. Different people would attribute to those terms very different meanings. For example, some people may believe that engaging in homosexual conduct is not at odds with being "morally straight" and "clean." And others may believe that engaging in homosexual conduct is contrary to being "morally straight" and "clean." The Boy Scouts says it falls within the latter category.

The New Jersey Supreme Court analyzed the Boy Scouts' beliefs and found that the "exclusion of members solely on the basis of their sexual orientation is inconsistent with Boy

Scouts' commitment to a diverse and 'representative' membership . . . [and] contradicts Boy Scouts' overarching objective to reach 'all eligible youth.'" 160 N. J., at 618, 734 A. 2d, at 1226. The court concluded that the exclusion of members like Dale "appears antithetical to the organization's goals and philosophy." *Ibid.* But our cases reject this sort of inquiry; it is not the role of the courts to reject a group's expressed values because they disagree with those values or find them internally inconsistent. See *Democratic Party of United States* v. *Wisconsin ex rel. La Follette,* 450 U. S. 107, 124 (1981) ("[A]s is true of all expressions of First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational"); see also *Thomas* v. *Review Bd. of Indiana Employment Security Div.,* 450 U. S. 707, 714 (1981) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection").

The Boy Scouts asserts that it "teach[es] that homosexual conduct is not morally straight," Brief for Petitioners 39, and that it does "not want to promote homosexual conduct as a legitimate form of behavior," Reply Brief for Petitioners 5. We accept the Boy Scouts' assertion. We need not inquire further to determine the nature of the Boy Scouts' expression with respect to homosexuality. But because the record before us contains written evidence of the Boy Scouts' viewpoint, we look to it as instructive, if only on the question of the sincerity of the professed beliefs.

A 1978 position statement to the Boy Scouts' Executive Committee, signed by Downing B. Jenks, the President of the Boy Scouts, and Harvey L. Price, the Chief Scout Executive, expresses the Boy Scouts' "official position" with regard to "homosexuality and Scouting":

> "Q. May an individual who openly declares himself to be a homosexual be a volunteer Scout leader?

"A. No. The Boy Scouts of America is a private, membership organization and leadership therein is a privilege and not a right. We do not believe that homosexuality and leadership in Scouting are appropriate. We will continue to select only those who in our judgment meet our standards and qualifications for leadership." App. 453–454.

Thus, at least as of 1978—the year James Dale entered Scouting—the official position of the Boy Scouts was that avowed homosexuals were not to be Scout leaders.

A position statement promulgated by the Boy Scouts in 1991 (after Dale's membership was revoked but before this litigation was filed) also supports its current view:

"We believe that homosexual conduct is inconsistent with the requirement in the Scout Oath that a Scout be morally straight and in the Scout Law that a Scout be clean in word and deed, and that homosexuals do not provide a desirable role model for Scouts." *Id.*, at 457.

This position statement was redrafted numerous times but its core message remained consistent. For example, a 1993 position statement, the most recent in the record, reads, in part:

"The Boy Scouts of America has always reflected the expectations that Scouting families have had for the organization. We do not believe that homosexuals provide a role model consistent with these expectations. Accordingly, we do not allow for the registration of avowed homosexuals as members or as leaders of the BSA." *Id.*, at 461.

The Boy Scouts publicly expressed its views with respect to homosexual conduct by its assertions in prior litigation. For example, throughout a California case with similar facts filed in the early 1980's, the Boy Scouts consistently asserted the same position with respect to homosexuality that it asserts today. See *Curran* v. *Mount Diablo Council of Boy*

*Scouts of America,* No. C–365529 (Cal. Super. Ct., July 25, 1991); 48 Cal. App. 4th 670, 29 Cal. Rptr. 2d 580 (1994); 17 Cal. 4th 670, 952 P. 2d 218 (1998). We cannot doubt that the Boy Scouts sincerely holds this view.

We must then determine whether Dale's presence as an assistant scoutmaster would significantly burden the Boy Scouts' desire to not "promote homosexual conduct as a legitimate form of behavior." Reply Brief for Petitioners 5. As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression. See, *e. g., La Follette, supra,* at 123–124 (considering whether a Wisconsin law burdened the National Party's associational rights and stating that "a State, or a court, may not constitutionally substitute its own judgment for that of the Party"). That is not to say that an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message. But here Dale, by his own admission, is one of a group of gay Scouts who have "become leaders in their community and are open and honest about their sexual orientation." App. 11. Dale was the copresident of a gay and lesbian organization at college and remains a gay rights activist. Dale's presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior.

*Hurley* is illustrative on this point. There we considered whether the application of Massachusetts' public accommodations law to require the organizers of a private St. Patrick's Day parade to include among the marchers an Irish-American gay, lesbian, and bisexual group, GLIB, violated the parade organizers' First Amendment rights. We noted that the parade organizers did not wish to exclude the GLIB members because of their sexual orientations, but because they wanted to march behind a GLIB banner. We observed:

> "[A] contingent marching behind the organization's banner would at least bear witness to the fact that some Irish are gay, lesbian, or bisexual, and the presence of the organized marchers would suggest their view that people of their sexual orientations have as much claim to unqualified social acceptance as heterosexuals . . . . The parade's organizers may not believe these facts about Irish sexuality to be so, or they may object to unqualified social acceptance of gays and lesbians or have some other reason for wishing to keep GLIB's message out of the parade. But whatever the reason, it boils down to the choice of a speaker not to propound a particular point of view, and that choice is presumed to lie beyond the government's power to control." 515 U. S., at 574–575.

Here, we have found that the Boy Scouts believes that homosexual conduct is inconsistent with the values it seeks to instill in its youth members; it will not "promote homosexual conduct as a legitimate form of behavior." Reply Brief for Petitioners 5. As the presence of GLIB in Boston's St. Patrick's Day parade would have interfered with the parade organizers' choice not to propound a particular point of view, the presence of Dale as an assistant scoutmaster would just as surely interfere with the Boy Scout's choice not to propound a point of view contrary to its beliefs.

The New Jersey Supreme Court determined that the Boy Scouts' ability to disseminate its message was not significantly affected by the forced inclusion of Dale as an assistant scoutmaster because of the following findings:

> "Boy Scout members do not associate for the purpose of disseminating the belief that homosexuality is immoral; Boy Scouts discourages its leaders from disseminating *any* views on sexual issues; and Boy Scouts includes sponsors and members who subscribe to different views

in respect of homosexuality." 160 N. J., at 612, 734 A. 2d, at 1223.

We disagree with the New Jersey Supreme Court's conclusion drawn from these findings.

First, associations do not have to associate for the "purpose" of disseminating a certain message in order to be entitled to the protections of the First Amendment. An association must merely engage in expressive activity that could be impaired in order to be entitled to protection. For example, the purpose of the St. Patrick's Day parade in *Hurley* was not to espouse any views about sexual orientation, but we held that the parade organizers had a right to exclude certain participants nonetheless.

Second, even if the Boy Scouts discourages Scout leaders from disseminating views on sexual issues—a fact that the Boy Scouts disputes with contrary evidence—the First Amendment protects the Boy Scouts' method of expression. If the Boy Scouts wishes Scout leaders to avoid questions of sexuality and teach only by example, this fact does not negate the sincerity of its belief discussed above.

Third, the First Amendment simply does not require that every member of a group agree on every issue in order for the group's policy to be "expressive association." The Boy Scouts takes an official position with respect to homosexual conduct, and that is sufficient for First Amendment purposes. In this same vein, Dale makes much of the claim that the Boy Scouts does not revoke the membership of heterosexual Scout leaders that openly disagree with the Boy Scouts' policy on sexual orientation. But if this is true, it is irrelevant.[1] The presence of an avowed homosexual and gay

---

[1] The record evidence sheds doubt on Dale's assertion. For example, the National Director of the Boy Scouts certified that "*any* persons who advocate to Scouting youth that homosexual conduct is" consistent with Scouting values will not be registered as adult leaders. App. 746 (emphasis added). And the Monmouth Council Scout Executive testified that the

rights activist in an assistant scoutmaster's uniform sends a distinctly different message from the presence of a heterosexual assistant scoutmaster who is on record as disagreeing with Boy Scouts policy. The Boy Scouts has a First Amendment right to choose to send one message but not the other. The fact that the organization does not trumpet its views from the housetops, or that it tolerates dissent within its ranks, does not mean that its views receive no First Amendment protection.

Having determined that the Boy Scouts is an expressive association and that the forced inclusion of Dale would significantly affect its expression, we inquire whether the application of New Jersey's public accommodations law to require that the Boy Scouts accept Dale as an assistant scoutmaster runs afoul of the Scouts' freedom of expressive association. We conclude that it does.

State public accommodations laws were originally enacted to prevent discrimination in traditional places of public accommodation—like inns and trains. See, e. g., *Hurley*, *supra*, at 571–572 (explaining the history of Massachusetts' public accommodations law); *Romer* v. *Evans*, 517 U. S. 620, 627–629 (1996) (describing the evolution of public accommodations laws). Over time, the public accommodations laws have expanded to cover more places.[2] New Jersey's statu-

advocacy of the morality of homosexuality to youth members by any adult member is grounds for revocation of the adult's membership. *Id.*, at 761.

[2] Public accommodations laws have also broadened in scope to cover more groups; they have expanded beyond those groups that have been given heightened equal protection scrutiny under our cases. See *Romer*, 517 U. S., at 629. Some municipal ordinances have even expanded to cover criteria such as prior criminal record, prior psychiatric treatment, military status, personal appearance, source of income, place of residence, and political ideology. See 1 Boston, Mass., Ordinance No. §12–9.7 (1999) (ex-offender, prior psychiatric treatment, and military status); D. C. Code Ann. §1–2519 (1999) (personal appearance, source of income, place of residence); Seattle, Wash., Municipal Code §14.08.090 (1999) (political ideology).

tory definition of " '[a] place of public accommodation' " is extremely broad. The term is said to "include, but not be limited to," a list of over 50 types of places. N. J. Stat. Ann. § 10:5–5(*l*) (West Supp. 2000); see Appendix, *infra*, at 661–663. Many on the list are what one would expect to be places where the public is invited. For example, the statute includes as places of public accommodation taverns, restaurants, retail shops, and public libraries. But the statute also includes places that often may not carry with them open invitations to the public, like summer camps and roof gardens. In this case, the New Jersey Supreme Court went a step further and applied its public accommodations law to a private entity without even attempting to tie the term "place" to a physical location.[3] As the definition of "public accommodation" has expanded from clearly commercial entities, such as restaurants, bars, and hotels, to membership organizations such as the Boy Scouts, the potential for conflict between state public accommodations laws and the First Amendment rights of organizations has increased.

We recognized in cases such as *Roberts* and *Duarte* that States have a compelling interest in eliminating discrimination against women in public accommodations. But in each of these cases we went on to conclude that the enforcement of these statutes would not materially interfere with the ideas that the organization sought to express. In *Roberts,* we said "[i]ndeed, the Jaycees has failed to demonstrate . . .

---

[3] Four State Supreme Courts and one United States Court of Appeals have ruled that the Boy Scouts is not a place of public accommodation. *Welsh* v. *Boy Scouts of America,* 993 F. 2d 1267 (CA7), cert. denied, 510 U. S. 1012 (1993); *Curran* v. *Mount Diablo Council of the Boy Scouts of America,* 17 Cal. 4th 670, 952 P. 2d 218 (1998); *Seabourn* v. *Coronado Area Council, Boy Scouts of America,* 257 Kan. 178, 891 P. 2d 385 (1995); *Quinnipiac Council, Boy Scouts of America, Inc.* v. *Comm'n on Human Rights & Opportunities,* 204 Conn. 287, 528 A. 2d 352 (1987); *Schwenk* v. *Boy Scouts of America,* 275 Ore. 327, 551 P. 2d 465 (1976). No federal appellate court or state supreme court—except the New Jersey Supreme Court in this case—has reached a contrary result.

any serious burdens on the male members' freedom of expressive association." 468 U. S., at 626. In *Duarte*, we said:

> "[I]mpediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment. In this case, however, the evidence fails to demonstrate that admitting women to Rotary Clubs will affect in any significant way the existing members' ability to carry out their various purposes." 481 U. S., at 548 (internal quotation marks and citations omitted).

We thereupon concluded in each of these cases that the organizations' First Amendment rights were not violated by the application of the States' public accommodations laws.

In *Hurley*, we said that public accommodations laws "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments." 515 U. S., at 572. But we went on to note that in that case "the Massachusetts [public accommodations] law has been applied in a peculiar way" because "any contingent of protected individuals with a message would have the right to participate in petitioners' speech, so that the communication produced by the private organizers would be shaped by all those protected by the law who wished to join in with some expressive demonstration of their own." *Id.*, at 572–573. And in the associational freedom cases such as *Roberts, Duarte,* and *New York State Club Assn.*, after finding a compelling state interest, the Court went on to examine whether or not the application of the state law would impose any "serious burden" on the organization's rights of expressive association. So in these cases, the associational interest in freedom of expression has

been set on one side of the scale, and the State's interest on the other.

Dale contends that we should apply the intermediate standard of review enunciated in *United States* v. *O'Brien*, 391 U. S. 367 (1968), to evaluate the competing interests. There the Court enunciated a four-part test for review of a governmental regulation that has only an incidental effect on protected speech—in that case the symbolic burning of a draft card. A law prohibiting the destruction of draft cards only incidentally affects the free speech rights of those who happen to use a violation of that law as a symbol of protest. But New Jersey's public accommodations law directly and immediately affects associational rights, in this case associational rights that enjoy First Amendment protection. Thus, *O'Brien* is inapplicable.

In *Hurley*, we applied traditional First Amendment analysis to hold that the application of the Massachusetts public accommodations law to a parade violated the First Amendment rights of the parade organizers. Although we did not explicitly deem the parade in *Hurley* an expressive association, the analysis we applied there is similar to the analysis we apply here. We have already concluded that a state requirement that the Boy Scouts retain Dale as an assistant scoutmaster would significantly burden the organization's right to oppose or disfavor homosexual conduct. The state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association. That being the case, we hold that the First Amendment prohibits the State from imposing such a requirement through the application of its public accommodations law.[4]

---

[4] We anticipated this result in *Hurley* when we illustrated the reasons for our holding in that case by likening the parade to a private membership organization. 515 U. S., at 580. We stated: "Assuming the parade

JUSTICE STEVENS' dissent makes much of its observation that the public perception of homosexuality in this country has changed. See *post*, at 699–700. Indeed, it appears that homosexuality has gained greater societal acceptance. See *ibid.* But this is scarcely an argument for denying First Amendment protection to those who refuse to accept these views. The First Amendment protects expression, be it of the popular variety or not. See, *e. g., Texas* v. *Johnson,* 491 U. S. 397 (1989) (holding that Johnson's conviction for burning the American flag violates the First Amendment); *Brandenburg* v. *Ohio,* 395 U. S. 444 (1969) *(per curiam)* (holding that a Ku Klux Klan leader's conviction for advocating unlawfulness as a means of political reform violates the First Amendment). And the fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.

JUSTICE STEVENS' extolling of Justice Brandeis' comments in *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311 (1932) (dissenting opinion); see *post*, at 664, 700, confuses two entirely different principles. In *New State Ice,* the Court struck down an Oklahoma regulation prohibiting the manufacture, sale, and distribution of ice without a license. Justice Brandeis, a champion of state experimentation in the economic realm, dissented. But Justice Brandeis was never a champion of state experimentation in the suppression of free speech. To the contrary, his First Amendment commentary provides compelling support for the Court's opinion in this case. In speaking of the Founders of this Nation, Justice Brandeis emphasized that they "believed that free-

---

to be large enough and a source of benefits (apart from its expression) that would generally justify a mandated access provision, GLIB could nonetheless be refused admission as an expressive contingent with its own message just as readily as a private club could exclude an applicant whose manifest views were at odds with a position taken by the club's existing members." *Id.,* at 580–581.

dom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth." *Whitney* v. *California,* 274 U. S. 357, 375 (1927) (concurring opinion). He continued:

> "Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed." *Id.,* at 375–376.

We are not, as we must not be, guided by our views of whether the Boy Scouts' teachings with respect to homosexual conduct are right or wrong; public or judicial disapproval of a tenet of an organization's expression does not justify the State's effort to compel the organization to accept members where such acceptance would derogate from the organization's expressive message. "While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley,* 515 U. S., at 579.

The judgment of the New Jersey Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

APPENDIX TO OPINION OF THE COURT

N. J. Stat. Ann. § 10:5–4 (West Supp. 2000). "Obtaining employment, accommodations and privileges without discrimination; civil right

"All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommoda-

tion, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, or sex, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right."

N. J. Stat. Ann. § 10:5-5 (West Supp. 2000). "Definitions

"As used in this act, unless a different meaning clearly appears from the context:

. . . . .

"*l.* 'A place of public accommodation' shall include, but not be limited to: any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind; any restaurant, eating house, or place where food is sold for consumption on the premises; any place maintained for the sale of ice cream, ice and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed for consumption on the premises; any garage, any public conveyance operated on land or water, or in the air, any stations and terminals thereof; any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic or hospital; any public library; any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey.

Nothing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private; nor shall anything herein contained apply to any educational facility operated or maintained by a bona fide religious or sectarian institution, and the right of a natural parent or one in loco parentis to direct the education and upbringing of a child under his control is hereby affirmed; nor shall anything herein contained be construed to bar any private secondary or post secondary school from using in good faith criteria other than race, creed, color, national origin, ancestry or affectional or sexual orientation in the admission of students."

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

New Jersey "prides itself on judging each individual by his or her merits" and on being "in the vanguard in the fight to eradicate the cancer of unlawful discrimination of all types from our society." *Peper* v. *Princeton Univ. Bd. of Trustees*, 77 N. J. 55, 80, 389 A. 2d 465, 478 (1978). Since 1945, it has had a law against discrimination. The law broadly protects the opportunity of all persons to obtain the advantages and privileges "of any place of public accommodation." N. J. Stat. Ann. § 10:5–4 (West Supp. 2000). The New Jersey Supreme Court's construction of the statutory definition of a "place of public accommodation" has given its statute a more expansive coverage than most similar state statutes. And as amended in 1991, the law prohibits discrimination on the basis of nine different traits including an individual's "sexual orientation."[1] The question in this case is whether that ex-

---

[1] In 1992, the statute was again amended to add "familial status" as a tenth protected class. It now provides:

"10:5–4 Obtaining employment, accommodations and privileges without discrimination; civil right

"All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any

pansive construction trenches on the federal constitutional rights of the Boy Scouts of America (BSA).

Because every state law prohibiting discrimination is designed to replace prejudice with principle, Justice Brandeis' comment on the States' right to experiment with "things social" is directly applicable to this case.

> "To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment. We may strike down the statute which embodies it on the ground that, in our opinion, the measure is arbitrary, capricious or unreasonable. We have power to do this, because the due process clause has been held by the Court applicable to matters of substantive law as well as to matters of procedure. But in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold." *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311 (1932) (dissenting opinion).

In its "exercise of this high power" today, the Court does not accord this "courageous State" the respect that is its due.

The majority holds that New Jersey's law violates BSA's right to associate and its right to free speech. But that law

---

place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, or sex, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right."

does not "impos[e] any serious burdens" on BSA's "collective effort on behalf of [its] shared goals," *Roberts* v. *United States Jaycees*, 468 U. S. 609, 622, 626–627 (1984), nor does it force BSA to communicate any message that it does not wish to endorse.   New Jersey's law, therefore, abridges no constitutional right of BSA.

I

James Dale joined BSA as a Cub Scout in 1978, when he was eight years old.   Three years later he became a Boy Scout, and he remained a member until his 18th birthday. Along the way, he earned 25 merit badges, was admitted into the prestigious Order of the Arrow, and was awarded the rank of Eagle Scout—an honor given to only three percent of all Scouts.   In 1989, BSA approved his application to be an Assistant Scoutmaster.

On July 19, 1990, after more than 12 years of active and honored participation, the BSA sent Dale a letter advising him of the revocation of his membership.   The letter stated that membership in BSA "is a privilege" that may be denied "whenever there is a concern that an individual may not meet the high standards of membership which the BSA seeks to provide for American youth."   App. 135.   Expressing surprise at his sudden expulsion, Dale sent a letter requesting an explanation of the decision.   *Id.*, at 136.   In response, BSA sent him a second letter stating that the grounds for the decision "are the standards for leadership established by the Boy Scouts of America, which specifically forbid membership to homosexuals."   *Id.*, at 137.   At that time, no such standard had been publicly expressed by BSA.

In this case, BSA contends that it teaches the young boys who are Scouts that homosexuality is immoral.   Consequently, it argues, it would violate its right to associate to force it to admit homosexuals as members, as doing so would be at odds with its own shared goals and values.   This contention, quite plainly, requires us to look at what, exactly, are the values that BSA actually teaches.

BSA's mission statement reads as follows: "It is the mission of the Boy Scouts of America to serve others by helping to instill values in young people and, in other ways, to prepare them to make ethical choices over their lifetime in achieving their full potential." *Id.*, at 184. Its federal charter declares its purpose is "to promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred values, using the methods which were in common use by Boy Scouts on June 15, 1916." 36 U. S. C. § 23; see also App. 315–316. BSA describes itself as having a "representative membership," which it defines as "boy membership [that] reflects proportionately the characteristics of the boy population of its service area." *Id.*, at 65. In particular, the group emphasizes that "[n]either the charter nor the bylaws of the Boy Scouts of America permits the exclusion of any boy. . . . To meet these responsibilities we have made a commitment that our membership shall be representative of *all* the population in every community, district, and council." *Id.*, at 66–67 (emphasis in original).

To instill its shared values, BSA has adopted a "Scout Oath" and a "Scout Law" setting forth its central tenets. For example, the Scout Law requires a member to promise, among other things, that he will be "obedient." Accompanying definitions for the terms found in the Oath and Law are provided in the Boy Scout Handbook and the Scoutmaster Handbook. For instance, the Boy Scout Handbook defines "obedient" as follows:

> "A Scout is OBEDIENT. A Scout follows the rules of his family, school, and troop. He obeys the laws of his community and country. If he thinks these rules and laws are unfair, he tries to have them changed in an orderly manner rather than disobey them." *Id.*, at 188 (emphasis deleted).

To bolster its claim that its shared goals include teaching that homosexuality is wrong, BSA directs our attention to two terms appearing in the Scout Oath and Law. The first is the phrase "morally straight," which appears in the Oath ("On my honor I will do my best . . . To keep myself . . . morally straight"); the second term is the word "clean," which appears in a list of 12 characteristics together constituting the Scout Law.

The Boy Scout Handbook defines "morally straight," as such:

> "To be a person of strong character, guide your life with honesty, purity, and justice. Respect and defend the rights of all people. Your relationships with others should be honest and open. Be clean in your speech and actions, and faithful in your religious beliefs. The values you follow as a Scout will help you become virtuous and self-reliant." *Id.*, at 218 (emphasis deleted).

The Scoutmaster Handbook emphasizes these points about being "morally straight":

> "In any consideration of moral fitness, a key word has to be 'courage.' A boy's courage to do what his head and his heart tell him is right. And the courage to refuse to do what his heart and his head say is wrong. Moral fitness, like emotional fitness, will clearly present opportunities for wise guidance by an alert Scoutmaster." *Id.*, at 239–240.

As for the term "clean," the Boy Scout Handbook offers the following:

> "A Scout is CLEAN. *A Scout keeps his body and mind fit and clean. He chooses the company of those who live by these same ideals. He helps keep his home and community clean.*
>
> "You never need to be ashamed of dirt that will wash off. If you play hard and work hard you can't help get-

ting dirty. But when the game is over or the work is done, that kind of dirt disappears with soap and water. "There's another kind of dirt that won't come off by washing. It is the kind that shows up in foul language and harmful thoughts.

"Swear words, profanity, and dirty stories are weapons that ridicule other people and hurt their feelings. The same is true of racial slurs and jokes making fun of ethnic groups or people with physical or mental limitations. A Scout knows there is no kindness or honor in such mean-spirited behavior. He avoids it in his own words and deeds. He defends those who are targets of insults." *Id.*, at 225–226 (emphasis in original); see also *id.*, at 189.[2]

It is plain as the light of day that neither one of these principles—"morally straight" and "clean"—says the slightest thing about homosexuality. Indeed, neither term in the Boy

---

[2] Scoutmasters are instructed to teach what it means to be "clean" using the following lesson:

"(Hold up two cooking pots, one shiny bright on the inside but sooty outside, the other shiny outside but dirty inside.) Scouts, which of these pots would you rather have your food cooked in? Did I hear somebody say, 'Neither one?'

"That's not a bad answer. We wouldn't have much confidence in a patrol cook who didn't have his pots shiny both inside and out.

"But if we had to make a choice, we would tell the cook to use the pot that's clean inside. The same idea applies to people.

"Most people keep themselves clean outside. But how about the inside? Do we try to keep our minds and our language clean? I think that's even more important than keeping the outside clean.

"A Scout, of course, should be clean inside and out. Water, soap, and a toothbrush tak[e] care of the outside. Only your determination will keep the inside clean. You can do it by following the Scout Law and the example of people you respect—your parents, your teachers, your clergyman, or a good buddy who is trying to do the same thing." App. 289–290.

Scouts' Law and Oath expresses any position whatsoever on sexual matters.

BSA's published guidance on that topic underscores this point. Scouts, for example, are directed to receive their sex education at home or in school, but not from the organization: "Your parents or guardian or a sex education teacher should give you the facts about sex that you must know." Boy Scout Handbook (1992) (reprinted in App. 211). To be sure, Scouts are not forbidden from asking their Scoutmaster about issues of a sexual nature, but Scoutmasters are, literally, the last person Scouts are encouraged to ask: "If you have questions about growing up, about relationships, sex, or making good decisions, ask. Talk with your parents, religious leaders, teachers, or Scoutmaster." *Ibid.* Moreover, Scoutmasters are specifically directed to steer curious adolescents to other sources of information:

> "If Scouts ask for information regarding . . . sexual activity, answer honestly and factually, but stay within your realm of expertise and comfort. If a Scout has serious concerns that you cannot answer, refer him to his family, religious leader, doctor, or other professional." Scoutmaster Handbook (1990) (reprinted in App. 264).

More specifically, BSA has set forth a number of rules for Scoutmasters when these types of issues come up:

> "You may have boys asking you for information or advice about sexual matters. . . .
>
> "How should you handle such matters?
>
> "Rule number 1: *You do not undertake to instruct Scouts, in any formalized manner, in the subject of sex and family life. The reasons are that it is not construed to be Scouting's proper area,* and that you are probably not well qualified to do this.
>
> "Rule number 2: If Scouts come to you to ask questions or to seek advice, you would give it within your compe-

tence. A boy who appears to be asking about sexual intercourse, however, may really only be worried about his pimples, so it is well to find out just what information is needed.

"Rule number 3: You should refer boys with sexual problems to persons better qualified than you [are] to handle them. If the boy has a spiritual leader or a doctor who can deal with them, he should go there. If such persons are not available, you may just have to do the best you can. But don't try to play a highly professional role. And at the other extreme, avoid passing the buck." Scoutmaster Handbook (1972) (reprinted in App. 546–547) (emphasis added).

In light of BSA's self-proclaimed ecumenism, furthermore, it is even more difficult to discern any shared goals or common moral stance on homosexuality. Insofar as religious matters are concerned, BSA's bylaws state that it is "absolutely nonsectarian in its attitude toward . . . religious training." *Id.*, at 362. "The BSA does not define what constitutes duty to God or the practice of religion. This is the responsibility of parents and religious leaders." *Id.*, at 76. In fact, many diverse religious organizations sponsor local Boy Scout troops. Brief for Petitioners 3. Because a number of religious groups do not view homosexuality as immoral or wrong and reject discrimination against homosexuals,[3] it is exceedingly difficult to believe that BSA none-

---

[3] See, *e. g.*, Brief for Deans of Divinity Schools and Rabbinical Institutions as *Amicus Curiae* 8 ("The diverse religi[ous] traditions of this country present no coherent moral message that excludes gays and lesbians from participating as full and equal members of those institutions. Indeed, the movement among a number of the nation's major religious institutions for many decades has been toward public recognition of gays and lesbians as full members of moral communities, and acceptance of gays and lesbians as religious leaders, elders and clergy"); Brief for General Board of Church and Society of the United Methodist Church et al. as

theless adopts a single particular religious or moral philosophy when it comes to sexual orientation. This is especially so in light of the fact that Scouts are advised to seek guidance on sexual matters from their religious leaders (and Scoutmasters are told to refer Scouts to them);[4] BSA surely is aware that some religions do not teach that homosexuality is wrong.

## II

The Court seeks to fill the void by pointing to a statement of "policies and procedures relating to homosexuality and Scouting," App. 453, signed by BSA's President and Chief Scout Executive in 1978 and addressed to the members of the Executive Committee of the national organization. *Ante*, at 651–652. The letter says that the BSA does "not believe that homosexuality and leadership in Scouting are appropriate." App. 454. But when the *entire* 1978 letter is read, BSA's position is far more equivocal:

> "4.  Q.  May an individual who openly declares himself to be a homosexual be employed by the Boy Scouts of America as a professional or non-professional?
>
> "A.  Boy Scouts of America does not knowingly employ homosexuals as professionals or non-professionals. We are unaware of any present laws which would prohibit this policy.

---

*Amicus Curiae* 3 (describing views of the United Methodist Church, the Episcopal Church, the Religious Action Center of Reform Judaism, the United Church Board for Homeland Ministries, and the Unitarian Universalist Association, all of whom reject discrimination on the basis of sexual orientation).

[4] See *supra*, at 667 ("Be . . . faithful in your religious beliefs"); *supra*, at 668, n. 2 ("by following . . . the example of . . . your clergyman"); *supra*, at 669 ("If you have questions about . . . sex, . . . [t]alk with your . . . religious leade[r]"); *ibid.* ("If Scouts ask for information regarding . . . sexual activity . . . refer him to his . . . religious leader"); *supra*, at 670 ("You should refer boys with sexual problems to [their] spiritual leader").

"5. Q. Should a professional or non-professional individual who openly declares himself to be a homosexual be terminated?

"A. Yes, *in the absence of any law to the contrary.* At the present time we are unaware of any statute or ordinance in the United States which prohibits discrimination against individual's employment upon the basis of homosexuality. *In the event that such a law was applicable, it would be necessary for the Boy Scouts of America to obey it, in this case as in Paragraph 4 above.* It is our position, however, that homosexuality and professional or non-professional employment in Scouting are not appropriate." *Id.,* at 454–455 (emphasis added).

Four aspects of the 1978 policy statement are relevant to the proper disposition of this case. First, at most this letter simply adopts an exclusionary membership policy. But simply adopting such a policy has never been considered sufficient, by itself, to prevail on a right to associate claim. See *infra,* at 678–685.

Second, the 1978 policy was never publicly expressed—unlike, for example, the Scout's duty to be "obedient." It was an internal memorandum, never circulated beyond the few members of BSA's Executive Committee. It remained, in effect, a secret Boy Scouts policy. Far from claiming any intent to express an idea that would be burdened by the presence of homosexuals, BSA's *public* posture—to the world and to the Scouts themselves—remained what it had always been: one of tolerance, welcoming all classes of boys and young men. In this respect, BSA's claim is even weaker than those we have rejected in the past. See *ibid.*

Third, it is apparent that the draftsmen of the policy statement foresaw the possibility that laws against discrimination might one day be amended to protect homosexuals from employment discrimination. Their statement clearly provided that, in the event such a law conflicted with their policy, a Scout's duty to be "obedient" and "obe[y] the laws," even if "he thinks [the laws] are unfair," would prevail in such a

contingency. See *supra*, at 666. In 1978, however, BSA apparently did not consider it to be a serious possibility that a State might one day characterize the Scouts as a "place of public accommodation" with a duty to open its membership to all qualified individuals. The portions of the statement dealing with membership simply assume that membership in the Scouts is a "privilege" that BSA is free to grant or to withhold. The statement does not address the question whether the publicly proclaimed duty to obey the law should prevail over the private discriminatory policy if, and when, a conflict between the two should arise—as it now has in New Jersey. At the very least, then, the statement reflects no unequivocal view on homosexuality. Indeed, the statement suggests that an appropriate way for BSA to preserve its unpublished exclusionary policy would include an open and forthright attempt to seek an amendment of New Jersey's statute. ("If he thinks these rules and laws are unfair, he tries to have them changed in an orderly manner rather than disobey them.")

Fourth, the 1978 statement simply says that homosexuality is not "appropriate." It makes no effort to connect that statement to a shared goal or expressive activity of the Boy Scouts. Whatever values BSA seeks to instill in Scouts, the idea that homosexuality is not "appropriate" appears entirely unconnected to, and is mentioned nowhere in, the myriad of publicly declared values and creeds of the BSA. That idea does not appear to be among any of the principles actually taught to Scouts. Rather, the 1978 policy appears to be no more than a private statement of a few BSA executives that the organization wishes to exclude gays—and that wish has nothing to do with any expression BSA actually engages in.

The majority also relies on four other policy statements that were issued between 1991 and 1993.[5] All of them were

---

[5] The authorship and distribution of these statements remain obscure. Unlike the 1978 policy—which clearly identifies the authors as the President and the Chief Scout Executive of BSA—these later policies are unsigned. Two of them are initialed (one is labeled "JCK"; the other says

written and issued *after* BSA revoked Dale's membership. Accordingly, they have little, if any, relevance to the legal question before this Court.[6]  In any event, they do not bolster BSA's claim.

In 1991, BSA issued two statements both stating: "We believe that homosexual conduct is inconsistent with the requirement in the Scout Oath that a Scout be morally straight and in the Scout Law that a Scout be clean in word and deed, and that homosexuals do not provide a desirable role model for Scouts." App. 457–458.  A third statement issued in 1992 was substantially the same. *Id.*, at 459.  By 1993, however, the policy had changed:

"BSA Position

"The Boy Scouts of America has always reflected the expectations that Scouting families have had for the organization.

"We do not believe that homosexuals provide a role model consistent with these expectations.

"Accordingly, we do not allow for the registration of avowed homosexuals as members or as leaders of the BSA." *Id.*, at 461.

Aside from the fact that these statements were all issued after Dale's membership was revoked, there are four important points relevant to them.  First, while the 1991 and 1992

---

"js"), but BSA never tells us to whom these initials belong.  Nor do we know how widely these statements were distributed.  From the record evidence we have, it appears that they were not as readily available as the Boy Scout and Scoutmaster Handbooks; indeed, they appear to be quite difficult to get a hold of.  See App. 662, 668–669.

[6] Dale's complaint requested three forms of relief: (1) a declaration that his rights under the New Jersey statute had been violated when his membership was revoked; (2) an order reinstating his membership; and (3) compensatory and punitive damages. *Id.*, at 27.  Nothing that BSA could have done after the revocation of his membership could affect Dale's first request for relief, though perhaps some possible postrevocation action could have influenced the other two requests for relief.

statements tried to tie BSA's exclusionary policy to the meaning of the Scout Oath and Law, the 1993 statement abandoned that effort. Rather, BSA's 1993 homosexual exclusion policy was based on its view that including gays would be contrary to "the expectations that Scouting families have had for the organization." *Ibid.* Instead of linking its policy to its central tenets or shared goals—to teach certain definitions of what it means to be "morally straight" and "clean"—BSA chose instead to justify its policy on the "expectatio[n]" that its members preferred to exclude homosexuals. The 1993 policy statement, in other words, was *not* based on any expressive activity or on any moral view about homosexuality. It was simply an exclusionary membership policy, similar to those we have held insufficient in the past. See *infra*, at 678–685.

Second, even during the brief period in 1991 and 1992, when BSA tried to connect its exclusion of homosexuals to its definition of terms found in the Oath and Law, there is no evidence that Scouts were actually taught anything about homosexuality's alleged inconsistency with those principles. Beyond the single sentence in these policy statements, there is no indication of any shared goal of teaching that homosexuality is incompatible with being "morally straight" and "clean." Neither BSA's mission statement nor its official membership policy was altered; no Boy Scout or Scoutmaster Handbook was amended to reflect the policy statement; no lessons were imparted to Scouts; no change was made to BSA's policy on limiting discussion of sexual matters; and no effort was made to restrict acceptable religious affiliations to those that condemn homosexuality. In short, there is no evidence that this view was part of any collective effort to foster beliefs about homosexuality.[7]

---

[7] Indeed, the record evidence is to the contrary. See, *e. g.,* App. 666–669 (affidavit of former Boy Scout whose young children were Scouts, and was himself an assistant scoutmaster and Merit Badge counselor) ("I never heard and am not aware of any discussion about homosexuality that oc-

Third, BSA never took any clear and unequivocal position on homosexuality. Though the 1991 and 1992 policies state one interpretation of "morally straight" and "clean," the group's published definitions appearing in the Boy Scout and Scoutmaster Handbooks take quite another view. And BSA's broad religious tolerance combined with its declaration that sexual matters are not its "proper area" render its views on the issue equivocal at best and incoherent at worst. We have never held, however, that a group can throw together any mixture of contradictory positions and then invoke the right to associate to defend any one of those views. At a minimum, a group seeking to prevail over an antidiscrimination law must adhere to a clear and unequivocal view.

Fourth, at most the 1991 and 1992 statements declare only that BSA believed "homosexual *conduct* is inconsistent with the requirement in the Scout Oath that a Scout be morally straight and in the Scout Law that a Scout be clean in word and deed." App. 457 (emphasis added). But New Jersey's law prohibits discrimination on the basis of sexual *orientation*. And when Dale was expelled from the Boy Scouts, BSA said it did so because of his sexual orientation, not because of his sexual conduct.[8]

It is clear, then, that nothing in these policy statements supports BSA's claim. The only policy written before the revocation of Dale's membership was an equivocal, undisclosed statement that evidences no connection between the group's discriminatory intentions and its expressive interests. The later policies demonstrate a brief—though ulti-

---

curred during any Scouting meeting or function .... Prior to September 1991, I never heard any mention whatsoever of homosexuality during any Scouting function").

[8] At oral argument, BSA's counsel was asked: "[W]hat if someone is homosexual in the sense of having a sexual orientation in that direction but does not engage in any homosexual conduct?" Counsel answered: "[I]f that person also were to take the view that the reason they didn't engage in that conduct [was because] it would be morally wrong . . . that person would not be excluded." Tr. of Oral Arg. 8.

mately abandoned—attempt to tie BSA's exclusion to its expression, but other than a single sentence, BSA fails to show that it ever taught Scouts that homosexuality is not "morally straight" or "clean," or that such a view was part of the group's collective efforts to foster a belief. Furthermore, BSA's policy statements fail to establish any clear, consistent, and unequivocal position on homosexuality. Nor did BSA have any reason to think Dale's sexual *conduct*, as opposed to his orientation, was contrary to the group's values.

BSA's inability to make its position clear and its failure to connect its alleged policy to its expressive activities is highly significant. By the time Dale was expelled from the Boy Scouts in 1990, BSA had already been engaged in several suits under a variety of state antidiscrimination public accommodation laws challenging various aspects of its membership policy.[9] Indeed, BSA had filed *amicus* briefs before this Court in two earlier right to associate cases (*Roberts* v. *United States Jaycees*, 468 U. S. 609 (1984), and *Board of Directors of Rotary Int'l* v. *Rotary Club of Duarte*, 481 U. S. 537 (1987)) pointing to these very cases; it was clearly on notice by 1990 that it might well be subjected to state public accommodation antidiscrimination laws, and that a court might one day reject its claimed right to associate. Yet it took no steps prior to Dale's expulsion to clarify how its exclusivity was connected to its expression. It speaks volumes about the credibility of BSA's claim to a shared goal that homosexuality is incompatible with Scouting that since at least 1984 it had been aware of this issue—indeed, concerned enough to twice file *amicus* briefs before this

---

[9] See, *e. g., Quinnipiac Council, Boy Scouts of America* v. *Commission on Human Rights and Opportunities*, 204 Conn. 287, 528 A. 2d 352 (1987) (challenge to BSA's exclusion of girls); *Curran* v. *Mount Diablo Council of the Boy Scouts of America*, 147 Cal. App. 3d 712, 195 Cal. Rptr. 325 (1983) (challenge to BSA's denial of membership to homosexuals; rejecting BSA's claimed right of association), overruled on other grounds, 17 Cal. 4th 670, 952 P. 2d 218 (1998).

Court—yet it did nothing in the intervening six years (or even in the years after Dale's explusion) to explain clearly and openly why the presence of homosexuals would affect its expressive activities, or to make the view of "morally straight" and "clean" taken in its 1991 and 1992 policies a part of the values actually instilled in Scouts through the Handbook, lessons, or otherwise.

## III

BSA's claim finds no support in our cases. We have recognized "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts*, 468 U. S., at 618. And we have acknowledged that "when the State interferes with individuals' selection of those with whom they wish to join in a common endeavor, freedom of association . . . may be implicated." *Ibid.* But "[t]he right to associate for expressive purposes is not . . . absolute"; rather, "the nature and degree of constitutional protection afforded freedom of association may vary depending on the extent to which . . . the constitutionally protected liberty is at stake in a given case." *Id.*, at 623, 618. Indeed, the right to associate does not mean "that in every setting in which individuals exercise some discrimination in choosing associates, their selective process of inclusion and exclusion is protected by the Constitution." *New York State Club Assn., Inc.* v. *City of New York*, 487 U. S. 1, 13 (1988). For example, we have routinely and easily rejected assertions of this right by expressive organizations with discriminatory membership policies, such as private schools,[10] law

---

[10] *Runyon* v. *McCrary*, 427 U. S. 160, 175–176 (1976) ("[T]he Court has recognized a First Amendment right 'to engage in association for the advancement of beliefs and ideas . . . .' From this principle it may be assumed that parents have a First Amendment right to send their children to educational institutions that promote the belief that racial segregation is desirable, and that the children have an equal right to attend such insti-

firms,[11] and labor organizations.[12]  In fact, until today, we have never once found a claimed right to associate in the selection of members to prevail in the face of a State's antidiscrimination law.  To the contrary, we have squarely held that a State's antidiscrimination law does not violate a group's right to associate simply because the law conflicts with that group's exclusionary membership policy.

In *Roberts* v. *United States Jaycees*, 468 U. S. 609 (1984), we addressed just such a conflict.  The Jaycees was a nonprofit membership organization " 'designed to inculcate in the individual membership . . . a spirit of genuine Americanism and civic interest, and . . . to provide . . . an avenue for intelligent participation by young men in the affairs of their community.' "  *Id.*, at 612–613.  The organization was divided into local chapters, described as " 'young men's organization[s],' " in which regular membership was restricted to males between the ages of 18 and 35.  *Id.*, at 613.  But Minnesota's Human Rights Act, which applied to the Jaycees, made it unlawful to " 'deny any person the full and equal

---

tutions.  But it does not follow that the *practice* of excluding racial minorities from such institutions is also protected by the same principle" (citation omitted)).

[11] *Hishon* v. *King & Spalding*, 467 U. S. 69, 78 (1984) ("[R]espondent argues that application of Title VII in this case would infringe constitutional rights of . . . association.  Although we have recognized that the activities of lawyers may make a 'distinctive contribution . . . to the ideas and beliefs of our society,' respondent has not shown how its ability to fulfill such a function would be inhibited by a requirement that it consider petitioner for partnership on her merits.  Moreover, as we have held in another context, '[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections' " (citations omitted)).

[12] *Railway Mail Assn.* v. *Corsi*, 326 U. S. 88, 93–94 (1945) ("Appellant first contends that [the law prohibiting racial discrimination by labor organizations] interfere[s] with its right of selection to membership . . . .  We see no constitutional basis for the contention that a state cannot protect workers from exclusion solely on the basis of race").

enjoyment of . . . a place of public accommodation because of . . . sex.'" *Id.*, at 615. The Jaycees, however, claimed that applying the law to it violated its right to associate—in particular its right to maintain its selective membership policy.

We rejected that claim. Cautioning that the right to associate is not "absolute," we held that "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.*, at 623. We found the State's purpose of eliminating discrimination is a compelling state interest that is unrelated to the suppression of ideas. *Id.*, at 623–626. We also held that Minnesota's law is the least restrictive means of achieving that interest. The Jaycees had "failed to demonstrate that the Act imposes any serious burdens on the male members' freedom of expressive association." *Id.*, at 626. Though the Jaycees had "taken public positions on a number of diverse issues, [and] . . . regularly engage in a variety of . . . activities worthy of constitutional protection under the First Amendment," there was "no basis in the record for concluding that admission of women as full voting members will impede the organization's ability to engage in these protected activities or to disseminate its preferred views." *Id.*, at 626–627. "The Act," we held, "requires no change in the Jaycees' creed of promoting the interest of young men, and it imposes no restrictions on the organization's ability to exclude individuals with ideologies or philosophies different from those of its existing members." *Id.*, at 627.

We took a similar approach in *Board of Directors of Rotary Int'l* v. *Rotary Club of Duarte*, 481 U. S. 537 (1987). Rotary International, a nonprofit corporation, was founded as "'an organization of business and professional men united worldwide who provide humanitarian service, encourage high ethical standards in all vocations, and help build good-

will and peace in the world.'" *Id.*, at 539. It admitted a cross section of worthy business and community leaders, *id.*, at 540, but refused membership to women. "[T]he exclusion of women," explained the group's General Secretary, "results in an 'aspect of fellowship . . . that is enjoyed by the present male membership.'" *Id.*, at 541. That policy also allowed the organization "to operate effectively in foreign countries with varied cultures and social mores." *Ibid.* Though California's Civil Rights Act, which applied to Rotary International, prohibited discrimination on the basis of sex, *id.*, at 541–542, n. 2, the organization claimed a right to associate, including the right to select its members.

As in *Jaycees*, we rejected the claim, holding that "the evidence fails to demonstrate that admitting women to Rotary Clubs will affect in any significant way the existing members' ability to carry out their various purposes." 481 U. S., at 548. "To be sure," we continued, "Rotary Clubs engage in a variety of commendable service activities that are protected by the First Amendment. But [California's Civil Rights Act] does not require the clubs to abandon or alter any of these activities. It does not require them to abandon their basic goals of humanitarian service, high ethical standards in all vocations, good will, and peace. Nor does it require them to abandon their classification system or admit members who do not reflect a cross section of the community." *Ibid.* Finally, even if California's law worked a "slight infringement on Rotary members' right of expressive association, that infringement is justified because it serves the State's compelling interest in eliminating discrimination against women." *Id.*, at 549.[13]

---

[13] BSA urged on brief that under the New Jersey Supreme Court's reading of the State's antidiscrimination law, "Boy Scout Troops would be forced to admit girls as members" and "Girl Scout Troops would be forced to admit boys." Brief for Petitioners 37. The New Jersey Supreme Court had no occasion to address that question, and no such issue is tendered for our decision. I note, however, the State of New Jersey's obser-

Several principles are made perfectly clear by *Jaycees* and *Rotary Club*. First, to prevail on a claim of expressive association in the face of a State's antidiscrimination law, it is not enough simply to engage in *some kind* of expressive activity. Both the Jaycees and the Rotary Club engaged in expressive activity protected by the First Amendment,[14] yet that fact was not dispositive. Second, it is not enough to adopt an openly avowed exclusionary membership policy. Both the Jaycees and the Rotary Club did that as well.[15] Third, it is not sufficient merely to articulate *some* connection between the group's expressive activities and its exclusionary policy. The Rotary Club, for example, justified its male-only membership policy by pointing to the "'aspect of fellowship . . . that is enjoyed by the [exclusively] male membership'" and by claiming that only with an exclusively male membership

---

vation that BSA ignores the exemption contained in New Jersey's law for "'any place of public accommodation which is in its nature reasonably restricted exclusively to one sex,'" including, but not limited to, "'any summer camp, day camp, or resort camp, bathhouse, dressing room, swimming pool, gymnasium, comfort station, dispensary, clinic or hospital, or school or educational institution which is restricted exclusively to individuals of one sex.'" See Brief for State of New Jersey as *Amicus Curiae* 12–13, n. 2 (citing N. J. Stat. Ann. §10:5–12(f) (West 1993)).

[14] See *Roberts* v. *United States Jaycees*, 468 U. S. 609, 626–627 (1984) ("[T]he organization [has] taken public positions on a number of diverse issues . . . worthy of constitutional protection under the First Amendment" (citations omitted)); *Board of Directors of Rotary Int'l* v. *Rotary Club of Duarte*, 481 U. S. 537, 548 (1987) ("To be sure, Rotary Clubs engage in a variety of commendable service activities that are protected by the First Amendment").

[15] The Jaycees openly stated that it was an organization designed to serve the interests of "young men"; its local chapters were described as "'young men's organization[s]'"; and its membership policy contained an express provision reserving regular membership to young men. *Jaycees*, 468 U. S., at 612–613. Likewise, Rotary International expressed its preference for male-only membership: It proclaimed that it was "'an organization of business and professional *men*'" and its membership policy expressly excluded women. *Rotary Club*, 481 U. S., at 539, 541 (emphasis added).

could it "operate effectively" in foreign countries. *Rotary Club*, 481 U. S., at 541.

Rather, in *Jaycees*, we asked whether Minnesota's Human Rights Law requiring the admission of women "impose[d] any *serious burdens*" on the group's "collective effort on behalf of [its] *shared goals.*" 468 U. S., at 622, 626–627 (emphases added). Notwithstanding the group's obvious publicly stated exclusionary policy, we did not view the inclusion of women as a "serious burden" on the Jaycees' ability to engage in the protected speech of its choice. Similarly, in *Rotary Club*, we asked whether California's law would "affect in any *significant way* the existing members' ability" to engage in their protected speech, or whether the law would require the clubs "to abandon their *basic goals.*" 481 U. S., at 548 (emphases added); see also *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 581 (1995) ("[A] private club could exclude an applicant whose manifest views were at odds with a position taken by the club's existing members"); *New York State Club Assn.*, 487 U. S., at 13 (to prevail on a right to associate claim, the group must "be able to show that it is organized for specific expressive purposes and that it will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its membership to those who share the same sex, for example, or the same religion"); *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 462–463 (1958) (asking whether law "entail[ed] the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association" and whether law is "likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs"). The relevant question is whether the mere inclusion of the person at issue would "impose any serious burden," "affect in any significant way," or be "a substantial restraint upon" the organization's "shared goals," "basic goals," or "collective effort to foster beliefs." Accordingly, it is necessary to examine what, exactly, are

BSA's shared goals and the degree to which its expressive activities would be burdened, affected, or restrained by including homosexuals.

The evidence before this Court makes it exceptionally clear that BSA has, at most, simply adopted an exclusionary membership policy and has no shared goal of disapproving of homosexuality. BSA's mission statement and federal charter say nothing on the matter; its official membership policy is silent; its Scout Oath and Law—and accompanying definitions—are devoid of any view on the topic; its guidance for Scouts and Scoutmasters on sexuality declare that such matters are "not construed to be Scouting's proper area," but are the province of a Scout's parents and pastor; and BSA's posture respecting religion tolerates a wide variety of views on the issue of homosexuality. Moreover, there is simply no evidence that BSA otherwise teaches anything in this area, or that it instructs Scouts on matters involving homosexuality in ways not conveyed in the Boy Scout or Scoutmaster Handbooks. In short, Boy Scouts of America is simply silent on homosexuality. There is no shared goal or collective effort to foster a belief about homosexuality at all—let alone one that is significantly burdened by admitting homosexuals.

As in *Jaycees*, there is "no basis in the record for concluding that admission of [homosexuals] will impede the [Boy Scouts'] ability to engage in [its] protected activities or to disseminate its preferred views" and New Jersey's law "requires no change in [BSA's] creed." 468 U. S., at 626–627. And like *Rotary Club*, New Jersey's law "does not require [BSA] to abandon or alter any of" its activities. 481 U. S., at 548. The evidence relied on by the Court is not to the contrary. The undisclosed 1978 policy certainly adds nothing to the actual views disseminated to the Scouts. It simply says that homosexuality is not "appropriate." There is no reason to give that policy statement more weight than Rotary International's assertion that all-male membership

fosters the group's "fellowship" and was the only way it could "operate effectively." As for BSA's postrevocation statements, at most they simply adopt a policy of discrimination, which is no more dispositive than the openly discriminatory policies held insufficient in *Jaycees* and *Rotary Club;* there is no evidence here that BSA's policy was necessary to— or even a part of—BSA's expressive activities or was ever taught to Scouts.

Equally important is BSA's failure to adopt any clear position on homosexuality. BSA's temporary, though ultimately abandoned, view that homosexuality is incompatible with being "morally straight" and "clean" is a far cry from the clear, unequivocal statement necessary to prevail on its claim. Despite the solitary sentences in the 1991 and 1992 policies, the group continued to disclaim any single religious or moral position as a general matter and actively eschewed teaching any lesson on sexuality. It also continued to define "morally straight" and "clean" in the Boy Scout and Scoutmaster Handbooks without any reference to homosexuality. As noted earlier, nothing in our cases suggests that a group can prevail on a right to expressive association if it, effectively, speaks out of both sides of its mouth. A State's antidiscrimination law does not impose a "serious burden" or a "substantial restraint" upon the group's "shared goals" if the group itself is unable to identify its own stance with any clarity.

## IV

The majority pretermits this entire analysis. It finds that BSA in fact "'teach[es] that homosexual conduct is not morally straight.'" *Ante,* at 651. This conclusion, remarkably, rests entirely on statements in BSA's briefs. See *ibid.* (citing Brief for Petitioners 39; Reply Brief for Petitioners 5). Moreover, the majority insists that we must "give deference to an association's assertions regarding the nature of its expression" and "we must also give deference to an association's view of what would impair its expression." *Ante,* at

653. So long as the record "contains written evidence" to support a group's bare assertion, "[w]e need not inquire further." *Ante,* at 651. Once the organization "asserts" that it engages in particular expression, *ibid.,* "[w]e cannot doubt" the truth of that assertion, *ante,* at 653.

This is an astounding view of the law. I am unaware of any previous instance in which our analysis of the scope of a constitutional right was determined by looking at what a litigant asserts in his or her brief and inquiring no further. It is even more astonishing in the First Amendment area, because, as the majority itself acknowledges, "we are obligated to independently review the factual record." *Ante,* at 648–649. It is an odd form of independent review that consists of deferring entirely to whatever a litigant claims. But the majority insists that our inquiry must be "limited," *ante,* at 650, because "it is not the role of the courts to reject a group's expressed values because they disagree with those values or find them internally inconsistent," *ante,* at 651. See also Brief for Petitioners 25 ("[T]he Constitution protects [BSA's] ability to control its own message").

But nothing in our cases calls for this Court to do any such thing. An organization can adopt the message of its choice, and it is not this Court's place to disagree with it. But we must inquire whether the group is, in fact, expressing a message (whatever it may be) and whether that message (if one is expressed) is significantly affected by a State's antidiscrimination law. More critically, that inquiry requires our *independent* analysis, rather than deference to a group's litigating posture. Reflection on the subject dictates that such an inquiry is required.

Surely there are instances in which an organization that truly aims to foster a belief at odds with the purposes of a State's antidiscrimination laws will have a First Amendment right to association that precludes forced compliance with those laws. But that right is not a freedom to discriminate at will, nor is it a right to maintain an exclusionary member-

ship policy simply out of fear of what the public reaction would be if the group's membership were opened up. It is an implicit right designed to protect the enumerated rights of the First Amendment, not a license to act on any discriminatory impulse. To prevail in asserting a right of expressive association as a defense to a charge of violating an antidiscrimination law, the organization must at least show it has adopted and advocated an unequivocal position inconsistent with a position advocated or epitomized by the person whom the organization seeks to exclude. If this Court were to defer to whatever position an organization is prepared to assert in its briefs, there would be no way to mark the proper boundary between genuine exercises of the right to associate, on the one hand, and sham claims that are simply attempts to insulate nonexpressive private discrimination, on the other hand. Shielding a litigant's claim from judicial scrutiny would, in turn, render civil rights legislation a nullity, and turn this important constitutional right into a farce. Accordingly, the Court's prescription of total deference will not do. In this respect, Justice Frankfurter's words seem particularly apt:

> "Elaborately to argue against this contention is to dignify a claim devoid of constitutional substance. Of course a State may leave abstention from such discriminations to the conscience of individuals. On the other hand, a State may choose to put its authority behind one of the cherished aims of American feeling by forbidding indulgence in racial or religious prejudice to another's hurt. To use the Fourteenth Amendment as a sword against such State power would stultify that Amendment. Certainly the insistence by individuals on their private prejudices as to race, color or creed, in relations like those now before us, ought not to have a higher constitutional sanction than the determination of a State to extend the area of nondiscrimination beyond that which the Constitution itself exacts." *Railway*

*Mail Assn.* v. *Corsi,* 326 U. S. 88, 98 (1945) (concurring opinion).

There is, of course, a valid concern that a court's independent review may run the risk of paying too little heed to an organization's sincerely held views. But unless one is prepared to turn the right to associate into a free pass out of antidiscrimination laws, an independent inquiry is a necessity. Though the group must show that its expressive activities will be substantially burdened by the State's law, if that law truly has a significant effect on a group's speech, even the subtle speaker will be able to identify that impact.

In this case, no such concern is warranted. It is entirely clear that BSA in fact expresses no clear, unequivocal message burdened by New Jersey's law.

V

Even if BSA's right to associate argument fails, it nonetheless might have a First Amendment right to refrain from including debate and dialogue about homosexuality as part of its mission to instill values in Scouts. It can, for example, advise Scouts who are entering adulthood and have questions about sex to talk "with your parents, religious leaders, teachers, or Scoutmaster," and, in turn, it can direct Scoutmasters who are asked such questions "not undertake to instruct Scouts, in any formalized manner, in the subject of sex and family life" because "it is not construed to be Scouting's proper area." See *supra,* at 669–670. Dale's right to advocate certain beliefs in a public forum or in a private debate does not include a right to advocate these ideas when he is working as a Scoutmaster. And BSA cannot be compelled to include a message about homosexuality among the values it actually chooses to teach its Scouts, if it would prefer to remain silent on that subject.

In *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624 (1943), we recognized that the government may not "requir[e] affirmation of a belief and an attitude of mind," nor

"force an American citizen publicly to profess any statement of belief," even if doing so does not require the person to "forego any contrary convictions of their own." *Id.*, at 633–634. "[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" *Hurley,* 515 U. S., at 573. Though the majority mistakenly treats this statement as going to the right to associate, it actually refers to a free speech claim. See *id.*, at 564–565, 580–581 (noting distinction between free speech and right to associate claims). As with the right to associate claim, though, the court is obligated to engage in an independent inquiry into whether the mere inclusion of homosexuals would actually force BSA to proclaim a message it does not want to send. *Id.*, at 567.

In its briefs, BSA implies, even if it does not directly argue, that Dale would use his Scoutmaster position as a "bully pulpit" to convey immoral messages to his troop, and therefore his inclusion in the group would compel BSA to include a message it does not want to impart. Brief for Petitioners 21–22. Even though the majority does not endorse that argument, I think it is important to explain why it lacks merit, before considering the argument the majority does accept.

BSA has not contended, nor does the record support, that Dale had ever advocated a view on homosexuality to his troop before his membership was revoked. Accordingly, BSA's revocation could only have been based on an assumption that he would do so in the future. But the only information BSA had at the time it revoked Dale's membership was a newspaper article describing a seminar at Rutgers University on the topic of homosexual teenagers that Dale attended. The relevant passage reads:

> "James Dale, 19, co-president of the Rutgers University Lesbian Gay Alliance with Sharice Richardson, also 19, said he lived a double life while in high school, pretending to be straight while attending a military academy.

"He remembers dating girls and even laughing at homophobic jokes while at school, only admitting his homosexuality during his second year at Rutgers.

" 'I was looking for a role model, someone who was gay and accepting of me,' Dale said, adding he wasn't just seeking sexual experiences, but a community that would take him in and provide him with a support network and friends." App. 517.

Nothing in that article, however, even remotely suggests that Dale would advocate any views on homosexuality to his troop. The Scoutmaster Handbook instructs Dale, like all Scoutmasters, that sexual issues are not their "proper area," and there is no evidence that Dale had any intention of violating this rule. Indeed, from all accounts Dale was a model Boy Scout and Assistant Scoutmaster up until the day his membership was revoked, and there is no reason to believe that he would suddenly disobey the directives of BSA because of anything he said in the newspaper article.

To be sure, the article did say that Dale was co-president of the Lesbian/Gay Alliance at Rutgers University, and that group presumably engages in advocacy regarding homosexual issues. But surely many members of BSA engage in expressive activities outside of their troop, and surely BSA does not want all of that expression to be carried on inside the troop. For example, a Scoutmaster may be a member of a religious group that encourages its followers to convert others to its faith. Or a Scoutmaster may belong to a political party that encourages its members to advance its views among family and friends.[16] Yet BSA does not think it is appropriate for Scoutmasters to proselytize a particular faith to unwilling Scouts or to attempt to convert them from one

---

[16] Scoutmaster Handbook (1990) (reprinted in App. 273) ("Scouts and Scouters are encouraged to take active part in political matters *as individuals*" (emphasis added)).

religion to another.[17]   Nor does BSA think it appropriate
for Scouts or Scoutmasters to bring politics into the troop.[18]
From all accounts, then, BSA does not discourage or forbid
outside expressive activity, but relies on compliance with its
policies and trusts Scouts and Scoutmasters alike not to
bring unwanted views into the organization.   Of course, a
disobedient member who flouts BSA's policy may be ex-
pelled.   But there is no basis for BSA to presume that a
homosexual will be unable to comply with BSA's policy not
to discuss sexual matters any more than it would presume
that politically or religiously active members could not resist
the urge to proselytize or politicize during troop meetings.[19]
As BSA itself puts it, its rights are "not implicated *unless* a
prospective leader *presents himself* as a role model incon-

---

[17] Bylaws of the Boy Scouts of America, Art. IX, § 1, cl. 3 (reprinted in
App. 363) ("In no case where a unit is connected with a church or other
distinctively religious organization shall members of other denominations
or faith be required, because of their membership in the unit, to take part
in or observe a religious ceremony distinctly unique to that organization
or church").

[18] Rules and Regulations of the Boy Scouts of America, Art. IX, § 2, cl. 6
(reprinted in App. 407) ("The Boy Scouts of America shall not, through its
governing body or through any of its officers, its chartered councils, or
members, involve the Scouting movement in any question of a political
character").

[19] Consider, in this regard, that a heterosexual, as well as a homosexual,
could advocate to the Scouts the view that homosexuality is not immoral.
BSA acknowledges as much by stating that a heterosexual who advocates
that view to Scouts would be expelled as well.   *Id.*, at 746 ("*[A]ny* persons
who advocate to Scouting youth that homosexual conduct is 'morally
straight' under the Scout Oath, or 'clean' under the Scout Law will not be
registered as adult leaders" (emphasis added)) (certification of BSA's Na-
tional Director of Program).   But BSA does not expel heterosexual mem-
bers who take that view *outside* of their participation in Scouting, as long
as they do not advocate that position to the Scouts.   Tr. of Oral Arg. 6.
And if there is no reason to presume that such a heterosexual will openly
violate BSA's desire to express no view on the subject, what reason—
other than blatant stereotyping—could justify a contrary presumption
for homosexuals?

sistent with Boy Scouting's understanding of the Scout Oath and Law." Brief for Petitioners 6 (emphases added).[20]

The majority, though, does not rest its conclusion on the claim that Dale will use his position as a bully pulpit. Rather, it contends that Dale's mere presence among the Boy Scouts will itself force the group to convey a message about homosexuality—even if Dale has no intention of doing so. The majority holds that "[t]he presence of an avowed homosexual and gay rights activist in an assistant scoutmaster's uniform sends a distinc[t] . . . message," and, accordingly, BSA is entitled to exclude that message. *Ante*, at 655–656. In particular, "Dale's presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of be-

---

[20] BSA cites three media interviews and Dale's affidavit to argue that he will openly advance a pro-gay agenda while being a Scoutmaster. None of those statements even remotely supports that conclusion. And *all* of them were made *after* Dale's membership was revoked and *after* this litigation commenced; therefore, they could not have affected BSA's revocation decision.

In a New York Times interview, Dale said "'I owe it *to the organization* to point out *to them* how bad and wrong this policy is.'" App. 513 (emphases added). This statement merely demonstrates that Dale wants to use *this litigation*—not his Assistant Scoutmaster position—to make a point, and that he wants to make the point to the BSA organization, not to the boys in his troop. At oral argument, BSA conceded that would not be grounds for membership revocation. Tr. of Oral Arg. 13. In a Seattle Times interview, Dale said Scouting is "'about giving adolescent boys a role model.'" App. 549. He did not say it was about giving them a role model who advocated a position on homosexuality. In a television interview, Dale also said "I am gay, and I'm very proud of who I am . . . . I stand up for what I believe in . . . . I'm not hiding anything." *Id.*, at 470. Nothing in that statement says anything about an intention to stand up for homosexual rights in any context other than in this litigation. Lastly, Dale said in his affidavit that he is "open and honest about [his] sexual orientation." *Id.*, at 133. Once again, like someone who is open and honest about his political affiliation, there is no evidence in that statement that Dale will not comply with BSA's policy when acting as a Scoutmaster.

havior." *Ante*, at 653; see also Brief for Petitioners 24 ("By donning the uniform of an adult leader in Scouting, he would 'celebrate [his] identity' as an openly gay Scout leader").

The majority's argument relies exclusively on *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557 (1995). In that case, petitioners John Hurley and the South Boston Allied War Veterans Council ran a privately operated St. Patrick's Day parade. Respondent, an organization known as "GLIB," represented a contingent of gays, lesbians, and bisexuals who sought to march in the petitioners' parade "as a way to express pride in their Irish heritage as openly gay, lesbian, and bisexual individuals." *Id.*, at 561. When the parade organizers refused GLIB's admission, GLIB brought suit under Massachusetts' antidiscrimination law. That statute, like New Jersey's law, prohibited discrimination on account of sexual orientation in any place of public accommodation, which the state courts interpreted to include the parade. Petitioners argued that forcing them to include GLIB in their parade would violate their free speech rights.

We agreed. We first pointed out that the St. Patrick's Day parade—like most every parade—is an inherently expressive undertaking. *Id.*, at 568–570. Next, we reaffirmed that the government may not compel anyone to proclaim a belief with which he or she disagrees. *Id.*, at 573–574. We then found that GLIB's marching in the parade would be an expressive act suggesting the view "that people of their sexual orientations have as much claim to unqualified social acceptance as heterosexuals." *Id.*, at 574. Finally, we held that GLIB's participation in the parade "would likely be perceived" as the parade organizers' own speech—or at least as a view which they approved—because of a parade organizer's customary control over who marches in the parade. *Id.*, at 575. Though *Hurley* has a superficial similarity to the present case, a close inspection reveals a wide gulf between that case and the one before us today.

First, it was critical to our analysis that GLIB was actually conveying a message by participating in the parade—otherwise, the parade organizers could hardly claim that they were being forced to include any unwanted message at all. Our conclusion that GLIB was conveying a message was inextricably tied to the fact that GLIB wanted to march in a parade, as well as the manner in which it intended to march. We noted the "inherent expressiveness of marching [in a parade] to make a point," *id.*, at 568, and in particular that GLIB was formed for the purpose of making a particular point about gay pride, *id.*, at 561, 570. More specifically, GLIB "distributed a fact sheet describing the members' intentions" and, in a previous parade, had "marched behind a shamrock-strewn banner with the simple inscription 'Irish American Gay, Lesbian and Bisexual Group of Boston.'" *Id.*, at 570. "[A] contingent marching behind the organization's banner," we said, would clearly convey a message. *Id.*, at 574. Indeed, we expressly distinguished between the members of GLIB, who marched as a unit to express their views about their own sexual orientation, on the one hand, and homosexuals who might participate as individuals in the parade without intending to express anything about their sexuality by doing so. *Id.*, at 572–573.

Second, we found it relevant that GLIB's message "would likely be perceived" as the parade organizers' own speech. *Id.*, at 575. That was so because "[p]arades and demonstrations . . . are not understood to be so neutrally presented or selectively viewed" as, say, a broadcast by a cable operator, who is usually considered to be "merely 'a conduit' for the speech" produced by others. *Id.*, at 575–576. Rather, parade organizers are usually understood to make the "customary determination about a unit admitted to the parade." *Id.*, at 575.

Dale's inclusion in the Boy Scouts is nothing like the case in *Hurley*. His participation sends no cognizable message to the Scouts or to the world. Unlike GLIB, Dale did not

carry a banner or a sign; he did not distribute any factsheet; and he expressed no intent to send any message. If there is any kind of message being sent, then, it is by the mere act of joining the Boy Scouts. Such an act does not constitute an instance of symbolic speech under the First Amendment.[21]

It is true, of course, that some acts are so imbued with symbolic meaning that they qualify as "speech" under the First Amendment. See *United States* v. *O'Brien*, 391 U. S. 367, 376 (1968). At the same time, however, "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Ibid.* Though participating in the Scouts could itself conceivably send a message on some level, it is not the kind of act that we have recognized as speech. See *Dallas* v. *Stanglin,* 490 U. S. 19, 24–25 (1989).[22] Indeed, if merely joining a group did constitute symbolic speech; and such speech were attributable to the group being joined; and that group has the right to exclude that speech (and hence, the right to exclude that person from joining), then the right of free speech effectively becomes a limitless right to exclude for every organization, whether or not it engages in *any* expressive activities. That cannot be, and never has been, the law.

---

[21] The majority might have argued (but it did not) that Dale had become so publicly and pervasively identified with a position advocating the moral legitimacy of homosexuality (as opposed to just being an individual who openly stated he is gay) that his leadership position in BSA would necessarily amount to using the organization as a conduit for publicizing his position. But as already noted, when BSA expelled Dale, it had nothing to go on beyond the one newspaper article quoted above, and one newspaper article does not convert Dale into a public symbol for a message. BSA simply has not provided a record that establishes the factual premise for this argument.

[22] This is not to say that Scouts do not engage in expressive activity. It is only to say that the simple act of joining the Scouts—unlike joining a parade—is not inherently expressive.

The only apparent explanation for the majority's holding, then, is that homosexuals are simply so different from the rest of society that their presence alone—unlike any other individual's—should be singled out for special First Amendment treatment. Under the majority's reasoning, an openly gay male is irreversibly affixed with the label "homosexual." That label, even though unseen, communicates a message that permits his exclusion wherever he goes. His openness is the sole and sufficient justification for his ostracism. Though unintended, reliance on such a justification is tantamount to a constitutionally prescribed symbol of inferiority.[23] As counsel for BSA remarked, Dale "put a banner around his neck when he . . . got himself into the newspaper. . . . He created a reputation. . . . He can't take that banner off. He put it on himself and, indeed, he has continued to put it on himself." See Tr. of Oral Arg. 25.

Another difference between this case and *Hurley* lies in the fact that *Hurley* involved the parade organizers' claim to determine the content of the message they wish to give at a particular time and place. The standards governing such a claim are simply different from the standards that govern BSA's claim of a right of expressive association. Generally, a private person or a private organization has a right to refuse to broadcast a message with which it disagrees, and a right to refuse to contradict or garble its own specific statement at any given place or time by including the messages of others. An expressive association claim, however, normally involves the avowal and advocacy of a consistent position on some issue over time. This is why a different kind of scrutiny must be given to an expressive association claim, lest the right of expressive association simply turn into a right to discriminate whenever some group can think of an expressive object that would seem to be inconsistent with the ad-

---

[23] See Yoshino, Suspect Symbols: The Literary Argument for Heightened Scrutiny for Gays, 96 Colum. L. Rev. 1753, 1781–1783 (1996).

mission of some person as a member or at odds with the appointment of a person to a leadership position in the group.

Furthermore, it is not likely that BSA would be understood to send any message, either to Scouts or to the world, simply by admitting someone as a member. Over the years, BSA has generously welcomed over 87 million young Americans into its ranks. In 1992 over one million adults were active BSA members. 160 N. J. 562, 571, 734 A. 2d 1196, 1200 (1999). The notion that an organization of that size and enormous prestige implicitly endorses the views that each of those adults may express in a non-Scouting context is simply mind boggling. Indeed, in this case there is no evidence that the young Scouts in Dale's troop, or members of their families, were even aware of his sexual orientation, either before or after his public statements at Rutgers University.[24] It is equally farfetched to assert that Dale's open declaration of his homosexuality, reported in a local newspaper, will effectively force BSA to send a message to anyone simply because it allows Dale to be an Assistant Scoutmaster. For an Olympic gold medal winner or a Wimbledon tennis champion, being "openly gay" perhaps communicates a message—for example, that openness about one's sexual orientation is more virtuous than concealment; that a homosexual person can be a capable and virtuous person who should be judged like anyone else; and that homosexuality is not immoral— but it certainly does not follow that they necessarily send a message on behalf of the organizations that sponsor the activities in which they excel. The fact that such persons participate in these organizations is not usually construed to convey a message on behalf of those organizations any more than does the inclusion of women, African-Americans, reli-

---

[24] For John Doe to make a public statement of his sexual orientation to the newspapers may, of course, be a matter of great importance to John Doe. Richard Roe, however, may be much more interested in the weekend weather forecast. Before Dale made his statement at Rutgers, the Scoutmaster of his troop did not know that he was gay. App. 465.

gious minorities, or any other discrete group.[25]  Surely the organizations are not forced by antidiscrimination laws to take any position on the legitimacy of any individual's private beliefs or private conduct.

The State of New Jersey has decided that people who are open and frank about their sexual orientation are entitled to equal access to employment as schoolteachers, police officers, librarians, athletic coaches, and a host of other jobs filled by citizens who serve as role models for children and adults alike.  Dozens of Scout units throughout the State are sponsored by public agencies, such as schools and fire departments, that employ such role models.  BSA's affiliation with numerous public agencies that comply with New Jersey's law against discrimination cannot be understood to convey any particular message endorsing or condoning the activities of all these people.[26]

---

[25] The majority simply announces, without analysis, that Dale's participation alone would "force the organization to send a message." *Ante*, at 653.  "But . . . these are merely conclusory words, barren of analysis. . . . For First Amendment principles to be implicated, the State must place the citizen in the position of either apparently or actually 'asserting as true' the message." *Wooley* v. *Maynard*, 430 U. S. 705, 721 (1977) (REHNQUIST, J., dissenting).

[26] BSA also argues that New Jersey's law violates its right to "intimate association." Brief for Petitioners 39–47.  Our cases recognize a substantive due process right "to enter into and carry on certain intimate or private relationships." *Rotary Club*, 481 U. S., at 545.  As with the First Amendment right to associate, the State may not interfere with the selection of individuals in such relationships. *Jaycees*, 468 U. S., at 618.  Though the precise scope of the right to intimate association is unclear, "we consider factors such as size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship" to determine whether a group is sufficiently personal to warrant this type of constitutional protection. *Rotary Club*, 481 U. S., at 546.  Considering BSA's size, see *supra*, at 697, its broad purposes, and its nonselectivity, see *supra*, at 666, it is impossible to conclude that being a member of the Boy Scouts ranks among those intimate relationships falling within this right, such as marriage, bearing children, rearing children, and cohabitation with relatives. *Rotary Club*, 481 U. S., at 545.

## VI

Unfavorable opinions about homosexuals "have ancient roots." *Bowers* v. *Hardwick*, 478 U. S. 186, 192 (1986). Like equally atavistic opinions about certain racial groups, those roots have been nourished by sectarian doctrine. *Id.*, at 196–197 (Burger, C. J., concurring); *Loving* v. *Virginia*, 388 U. S. 1, 3 (1967).[27] See also *Mathews* v. *Lucas*, 427 U. S. 495, 520 (1976) (STEVENS, J., dissenting) ("Habit, rather than analysis, makes it seem acceptable and natural to distinguish between male and female, alien and citizen, legitimate and illegitimate; for too much of our history there was the same inertia in distinguishing between black and white"). Over the years, however, interaction with real people, rather than mere adherence to traditional ways of thinking about members of unfamiliar classes, have modified those opinions. A few examples: The American Psychiatric Association's and the American Psychological Association's removal of "homosexuality" from their lists of mental disorders;[28] a move toward greater understanding within some religious communities;[29] Justice Blackmun's classic opinion in *Bowers*;[30]

---

[27] In *Loving*, the trial judge gave this explanation of the rationale for Virginia's antimiscegenation statute: "'Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with his arrangement there would be no cause for such marriages. The fact that he separated the races shows that he did not intend for the races to mix.'" 388 U. S., at 3.

[28] Brief for American Psychological Association as *Amicus Curiae* 8.

[29] See n. 3, *supra.*

[30] The significance of that opinion is magnified by comparing it with Justice Blackmun's vote 10 years earlier in *Doe* v. *Commonwealth's Attorney for City of Richmond*, 425 U. S. 901 (1976). In that case, six Justices—including Justice Blackmun—voted to summarily affirm the District Court's rejection of the same due process argument that was later rejected in *Bowers*. Two years later, furthermore, Justice Blackmun joined in a dissent in *University of Missouri* v. *Gay Lib*, 434 U. S. 1080 (1978). In that case, the university had denied recognition to a student gay rights organization. The student group argued that in doing so, the university had violated its free speech and free association rights. The Court of

Georgia's invalidation of the statute upheld in *Bowers;* [31] and New Jersey's enactment of the provision at issue in this case. Indeed, the past month alone has witnessed some remarkable changes in attitudes about homosexuals. [32]

That such prejudices are still prevalent and that they have caused serious and tangible harm to countless members of the class New Jersey seeks to protect are established matters of fact that neither the Boy Scouts nor the Court disputes. That harm can only be aggravated by the creation of a constitutional shield for a policy that is itself the product of a habitual way of thinking about strangers. As Justice Brandeis so wisely advised, "we must be ever on our guard, lest we erect our prejudices into legal principles."

If we would guide by the light of reason, we must let our minds be bold. I respectfully dissent.

JUSTICE SOUTER, with whom JUSTICE GINSBURG and JUSTICE BREYER join, dissenting.

I join JUSTICE STEVENS's dissent but add this further word on the significance of Part VI of his opinion. There, JUSTICE STEVENS describes the changing attitudes toward gay people and notes a parallel with the decline of stereotypical thinking about race and gender. The legitimacy of New

---

Appeals agreed with that argument. A dissent from denial of certiorari, citing the university's argument, suggested that the proper analysis might well be as follows:

"[T]he question is more akin to whether those suffering from measles have a constitutional right, in violation of quarantine regulations, to associate together and with others who do not presently have measles, in order to urge repeal of a state law providing that measle sufferers be quarantined." *Id.,* at 1084 (REHNQUIST, J., dissenting).

[31] *Powell* v. *State,* 270 Ga. 327, 510 S. E. 2d 18 (1998).

[32] See, *e. g.,* Bradsher, Big Carmakers Extend Benefits to Gay Couples, New York Times, June 9, 2000, p. C1; Marquis, Gay Pride Day is Observed by About 60 C. I. A. Workers, New York Times, June 9, 2000, p. A26; Zernike, Gay Couples are Accepted as Role Models at Exeter, New York Times, June 12, 2000, p. A18.

Jersey's interest in forbidding discrimination on all these bases by those furnishing public accommodations is, as JUSTICE STEVENS indicates, acknowledged by many to be beyond question. The fact that we are cognizant of this laudable decline in stereotypical thinking on homosexuality should not, however, be taken to control the resolution of this case.

Boy Scouts of America (BSA) is entitled, consistently with its own tenets and the open doors of American courts, to raise a federal constitutional basis for resisting the application of New Jersey's law. BSA has done that and has chosen to defend against enforcement of the state public accommodations law on the ground that the First Amendment protects expressive association: individuals have a right to join together to advocate opinions free from government interference. See *Roberts* v. *United States Jaycees,* 468 U. S. 609, 622 (1984). BSA has disclaimed any argument that Dale's past or future actions, as distinct from his unapologetic declaration of sexual orientation, would justify his exclusion from BSA. See Tr. of Oral Arg. 12–13.

The right of expressive association does not, of course, turn on the popularity of the views advanced by a group that claims protection. Whether the group appears to this Court to be in the vanguard or rearguard of social thinking is irrelevant to the group's rights. I conclude that BSA has not made out an expressive association claim, therefore, not because of what BSA may espouse, but because of its failure to make sexual orientation the subject of any unequivocal advocacy, using the channels it customarily employs to state its message. As JUSTICE STEVENS explains, no group can claim a right of expressive association without identifying a clear position to be advocated over time in an unequivocal way. To require less, and to allow exemption from a public accommodations statute based on any individual's difference from an alleged group ideal, however expressed and however inconsistently claimed, would convert the right of expres-

sive association into an easy trump of any antidiscrimination law.*

If, on the other hand, an expressive association claim has met the conditions JUSTICE STEVENS describes as necessary, there may well be circumstances in which the antidiscrimination law must yield, as he says. It is certainly possible for an individual to become so identified with a position as to epitomize it publicly. When that position is at odds with a group's advocated position, applying an antidiscrimination statute to require the group's acceptance of the individual in a position of group leadership could so modify or muddle or frustrate the group's advocacy as to violate the expressive associational right. While it is not our business here to rule on any such hypothetical, it is at least clear that our estimate of the progressive character of the group's position will be irrelevant to the First Amendment analysis if such a case comes to us for decision.

---

*An expressive association claim is in this respect unlike a basic free speech claim, as JUSTICE STEVENS points out; the latter claim, i. e., the right to convey an individual's or group's position, if bona fide, may be taken at face value in applying the First Amendment. This case is thus unlike *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557 (1995).