PADOVANO, J.
 

 The National Collegiate Athletic Association appeals a final judgment requiring it to disclose certain documents to The Associated Press and other news organizations joined as plaintiffs in an action under Chapter 119, Florida Statutes. We find no error in the decision by the trial court. Accordingly, we affirm the judgment for the plaintiffs.
 

 Records created and maintained by the NCAA are not generally subject to public disclosure. However, the documents at issue in this case were examined by lawyers for a public agency, Florida State University, and used in the course of the agency’s business. Because the documents were received in connection with the transaction of official business by an agency, they are public records. The NCAA has failed to show that an exception applies under state or federal law, and thus the records must be disclosed.
 

 I.
 

 The events leading to the present controversy began in March 2007, when the
 
 *1205
 
 University became aware of allegations that a learning specialist and an academic tutor had provided improper assistance to a number of students, some of whom were participating in athletic programs. The University engaged the services of a private firm to conduct an internal investigation on its behalf. On February 14, 2008, after the completion of a comprehensive self-investigation of academic misconduct, the University reported its findings to the NCAA.
 

 Several months later, on June 10, 2008, the NCAA issued a notice of allegations to the University. The effect of the notice was to formally initiate a disciplinary proceeding regarding the misconduct the University had previously reported to the NCAA. The University submitted a response to the allegations, and the case was called up for a hearing on October 28, 2008, before the NCAA’s Committee on Infractions. The transcript of the hearing before the committee has not been made public.
 

 On March 6, 2009, the NCAA’s Committee on Infractions issued an infractions report. As a part of the report, the committee imposed penalties against the University for the academic misconduct, including an order that certain athletic victories be vacated. The report was provided to the University in paper form, and, after the names of the students had been redacted, the report was made public.
 

 The University then retained the Gray-Robinson law firm to file an appeal to the NCAA from the penalties imposed by the committee. Because the work of the committee was done in private, the lawyers had to make an arrangement with the NCAA to obtain access to the records relevant to the enforcement proceeding. The arrangement was as follows. The NCAA put images of the transcript of the October 28, 2008 hearing and other records on a secure Internet website. Lawyers for GrayRobinson signed a confidentiality agreement with the NCAA promising not to disclose any information they obtained from the website. The NCAA then gave the lawyers a password they could use to obtain the information from the website.
 

 This is the system the NCAA uses with all of its member institutions. Julie Roe, the Director of Enforcement for the NCAA, testified that the system was developed in 2007 as part of an effort to go “paperless.” She referred to the secure website as the “custodial website.” Authorized representatives of member institutions could go to the website to obtain access to information they needed to resolve their disputes with the NCAA, and, at the same time, the NCAA could avoid public disclosure of confidential sources of information used in its investigations.
 

 After they had signed the confidentiality agreement, the lawyers at GrayRobinson examined the transcript of the October 28, 2008 hearing before the Committee on Infractions. The lawyers then used the information in the transcript to prepare the University’s appeal to the NCAA. They filed the initial brief on behalf of the University on April 23, 2009, and the Committee on Infractions filed a written response on June 2, 2009. The response was submitted to the NCAA as a part of the appeal. It was considered to be the property of the NCAA and it was not disclosed to the public.
 

 The plaintiffs in the present case sought disclosure of documents in the NCAA disciplinary proceeding and appeal and, when the request was denied, they filed suit under Chapter 119, Florida Statutes against the NCAA, Florida State University, its President, and the GrayRobinson law firm. In the early stages of the case,
 
 *1206
 
 the NCAA offered to produce the June 2, 2009 response by the Committee on Infractions. However, the NCAA declined to provide the response in its original format, and the document that was given to the plaintiffs was a version of the report that had been retyped by University personnel from the image on the custodial website. The plaintiffs did not regard the retyped version of the response as compliance with their public records request.
 

 The public records case was tried before the court on August 20, 2009. Two documents were at issue in the litigation: the transcript of the October 28, 2008 hearing before the NCAA Committee on Infractions and the Committee’s June 2, 2009 response to the University’s appeal. The plaintiffs argued that both documents were public records. The NCAA argued that the documents were not public records and, alternatively, that they were exempt under federal laws protecting student records.
 

 On August 28, 2009, the trial court rendered judgment for the plaintiffs. In summary, the trial court concluded that the transcript and response were public records because they were received by an agency of the state government and that they were not exempt under federal laws designed to protect students because they did not contain information directly related to a student. The court ordered the immediate disclosure of the transcript and response, but the NCAA appealed to this court, and the judgment by the trial court was stayed pending the disposition of the appeal.
 

 II.
 

 The issues presented in this appeal are governed by the organic law of the state. The Florida Constitution creates a broad right to inspect the records of any state or local governmental body. Article I, section 24(a) of the Florida Constitution grants “[ejvery person ... the right to inspect or copy any public record made or received in connection with the official business of any public body, officer or employee of the state, or persons acting on their behalf.” The right to inspect a public record in Florida is not one that is merely established by legislation, it is a right demanded by the people.
 

 Article I, section 24(c) of the Florida Constitution provides that the right to inspect public records shall be “self-executing.” Legislation is not required to implement the right, but section 24(c) expressly grants authority to the Florida Legislature to “enact laws governing the enforcement of this section.” The rights created by the constitution may be enforced under the procedures in the public records law, Chapter 119, Florida Statutes. The opening sentence of the law declares that “[i]t is the policy in this state that all state, county and municipal records are open for personal inspection and copying by any person” and that “[providing access to public records is a duty of each agency.”
 

 Florida courts construe the public records law liberally in favor of the state’s policy of open government.
 
 See Lightbourne v. McCollum,
 
 969 So.2d 326 (Fla.2007);
 
 Wolfson v. State,
 
 344 So.2d 611 (Fla. 2d DCA 1977);
 
 Tribune Co. v. In re Public Records,
 
 493 So.2d 480 (Fla. 2d DCA 1986);
 
 City of Riviera Beach v. Barfield,
 
 642 So.2d 1135 (Fla. 4th DCA 1994). If there is any doubt about the application of the law in a particular case, the doubt is resolved in favor of disclosing the documents.
 
 See Dade County Aviation Consultants v. Knight Ridder, Inc.,
 
 800 So.2d 302 (Fla. 3d DCA 2001).
 

 a.
 

 With these principles in mind, we turn to the first issue in the case, whether
 
 *1207
 
 the transcript and response are public records. We begin by observing that the public records law is not limited to paper documents but that it applies, as well, to documents that exist only in digital form. Section 119.01(2)(a) makes it clear that the public records law applies to documents maintained on a computer in the same way that it would apply to those kept in a file cabinet. This section notes the increased dependency on computerized records and it directs that “each agency must provide reasonable access to records electronically maintained.” It goes on to conclude that the automation of public records “must not erode the right of access to those records.”
 

 To determine whether a particular document qualifies as a public record the court must look first to the definition given in the law itself. Section 119.011(12) defines the term “public record” as:
 

 all documents, papers, letters, maps, books, tapes, photographs, films, sound records, data processing software, or other material, regardless of the physical form, characteristic or means of transmission, made or received pursuant to law or ordinance in connection with the transaction of official business.
 

 By this definition, a document may qualify as a public record under the statute if it was prepared by a private party, so long as it was “received” by a government agent and used in the transaction of public business.
 

 The Florida Supreme Court provided additional guidance to the lower courts in
 
 Shevin v. Byron, Harless, Schaffer, Reid & Associates, Inc.,
 
 379 So.2d 633 (Fla.1980). In that case, the court defined the term “record” as used in section 119.011(12) as “any material prepared in connection with official agency business which is intended to perpetuate, communicate, or formalize knowledge of some type.”
 
 Shevin,
 
 379 So.2d at 640. This definition was intended “to give content to the public records law” by attributing a meaning to the term “record” that is “consistent with common understanding of the term.”
 
 Shevin
 
 at 640.
 

 Based on these authorities, we conclude that the transcript and response are public records. Although these documents were prepared and maintained by a private organization, they were “received” by agents of a public agency and used in connection with public business. The purpose of the transcript was to perpetuate the information presented to the infractions committee, in the event the parties wished to appeal the sanction imposed by the committee. The response was designed to communicate information to the body that would hear the appeal within the NCAA.
 

 The term “received” in section 119.011(12) refers not only to a situation in which a public agent takes physical delivery of a document, but also to one in which a public agent examines a document residing on a remote computer. If that were not the case, a party could easily circumvent the public records laws. The appeal by the University is a matter of public concern. It is not transformed into a private matter merely because the documents the University lawyers used to prepare the appeal reside on a computer owned by a private organization. As the plaintiffs expressed this point, the definition of a public record does not turn on the sender’s method of transmission.
 

 Our conclusion that the transcript and response became public records when they were examined by state lawyers and used for a public purpose is supported by the decision of the Second District Court of Appeal in
 
 Times Publishing Co. v. City of St. Petersburg,
 
 558 So.2d 487 (Fla. 2d DCA 1990). That case involved negotiations be
 
 *1208
 
 tween the Chicago White Sox and the City of St. Petersburg for the use of the Sun-coast Dome. The documents pertaining to the negotiations were prepared and maintained exclusively by the White Sox, but they were examined by agents for the City under a confidentiality agreement. The court held that the documents were subject to disclosure under the public records law because they were examined by agents for the City and used in the course of its business.
 

 These principles apply with equal force here. It is true, as the NCAA points out, that the documents at issue in
 
 Times Publishing
 
 were modified at the request of the City, but that is a distinction without a difference. A document that is used in the course of public business is a public record under the definition in section 119.011(12) if it was made by a public official or if was received by the official. If it was received, that is enough. It is not necessary to also show that it was made, partly made, or modified in some way by the official.
 

 The NCAA argues that a document is not “received” within the meaning of the public records law merely because it is viewed by an agent of the state. According to the NCAA, the danger in equating viewing with receiving, is that it could result in the disclosure of information that should remain private. An agent who has a password to the secure site would have access to a great deal of confidential information, some of it unrelated to the member institution the agent represents. This information, the NCAA argues, should not be disclosed as a public record merely because a public agent examined it.
 

 We accept the general premise of this argument, but the point the NCAA has not taken into account is that the documents in this case were not merely viewed, they were used in connection with public business. The transcript is a 350-page document; the GrayRobinson lawyers did not use their password to read it out of idle curiosity. To the contrary, they examined it professionally for a legitimate governmental purpose. The transcript literally became a part of the University’s appeal and therefore a matter of public business. The same is true of the response. It was the committee’s answer to the University’s appeal.
 

 We would be more inclined to accept the NCAA’s argument that viewing is not the equivalent of receiving if the documents at issue had not been directly related to the work these lawyers were doing for the state. If the GrayRobinson lawyers had used their password to look at the disciplinary records of a student athlete from a private school in New York, the NCAA would have a good argument that the record did not become public merely because it was “viewed” by someone who happened to work for the State of Florida. The point overlooked in the NCAA’s argument, however, is that the records in this case were examined and used for an official state purpose.
 

 The lawyers signed a confidentiality agreement with the NCAA, but that has no impact on our decision that the transcript and response are public records. A public record cannot be transformed into a private record merely because an agent of the government has promised that it will be kept private.
 
 See Gadd v. News-Press Publ’g Co.,
 
 412 So.2d 894, 896 (Fla. 2d DCA 1982);
 
 Browning v. Walton,
 
 351 So.2d 380, 381 (Fla. 4th DCA 1977). Nor is it material that the NCAA had an expectation that the documents would remain private. As we explained in
 
 Sepro Corp. v. Florida Department of Environmental Protection,
 
 839 So.2d 781, 784 (Fla. 1st DCA 2003), “[A] private party cannot render public records exempt from disclosure merely by designating information it fur
 
 *1209
 
 nishes a governmental agency confidential.” The right to examine these records is a right belonging to the public; it cannot be bargained away by a representative of the government.
 

 The trial judge also concluded that the University had improperly delegated its recordkeeping function to the NCAA. We have no reason to disagree with the trial judge on this point, but we need not address the point to determine the correctness of the judgment. It appears that the issue was interjected into the case by conflating one legal theory with another. In our view, the issue has no bearing on the outcome of the appeal.
 

 In limited but well defined circumstances, a record created and maintained by a private organization can be subject to disclosure as a public record on an agency theory. For example, if a private entity is acting on behalf of the state or local government and creates a document that reflects the business of the governmental entity, the document can become a public record. In
 
 News and Sun-Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc.,
 
 596 So.2d 1029 (Fla.1992), the supreme court set out a nine-factor test to determine whether records held by a private party must be disclosed under the public record act on the theory that the private party is acting on behalf of the government.
 

 The critical question in this line of cases is whether the private party is a
 
 “private agency, person, partnership, corporation
 
 or
 
 business entity acting on behalf of [a] public agency”
 
 that has therefore become an “agency,” as defined in section 119.011(2) Florida Statutes, (emphasis added) The common feature of all of the cases in this line of authority, including our own recent decision in
 
 B & S Utilities v. Baskerville-Donovan, Inc.,
 
 988 So.2d 17 (Fla. 1st DCA 2008), is that they all involve efforts to determine whether a private entity has assumed the role of the government.
 
 See, e.g., New York Times Co. v. PHH Mental Health Servs., Inc.,
 
 616 So.2d 27 (Fla.1993);
 
 Weekly Planet, Inc. v. Hillsborough County Aviation Auth.,
 
 829 So.2d 970 (Fla. 2d DCA 2002);
 
 Dade Aviation Consultants, Inc. v. Knight Ridder, Inc.,
 
 800 So.2d 302 (Fla. 3d DCA 2001);
 
 Putnam County Humane Society, Inc. v. Woodward,
 
 740 So.2d 1238 (Fla. 5th DCA 1999). Typically, the private entity has a contract with the government and performs a public function in the course of its duties under the contract. The private entity is acting not as a business adversary to the government but as a surrogate for the government.
 

 The issue in the present case is much less complicated. The transcript and response are public records because they were received by agents of the state and used in the course of the state’s business. We need not apply the nine-factor test in
 
 Schwab
 
 to come to this conclusion. Nor is it necessary to decide whether the NCAA became a public “agency” in its own right under section 119.011(2) by stepping into the shoes of the University and assuming a public duty of the University. The documents at issue in this case became public records by a much more direct route: they were received by agents of the University and used in connection with the University’s business. The legal status of these records is no different than it would be if they had been prepared by the University’s lawyers and if the only existing copies were in the NCAA’s possession.
 

 The enforcement of the public records law is also relatively straightforward in a situation like this. Section 119.07(l)(a), Florida Statutes states that “every
 
 person
 
 who has custody of a public record shall permit the record to be in
 
 *1210
 
 spected and copied by any person desiring to do so .... ” (emphasis added) The plain meaning of this statute is that the public records law can be enforced against any person who has custody of public records, whether that person is employed by the public agency creating or receiving the records or not. It makes no difference that the records in question are in the hands of a private party. If they are public records, they are subject to compelled disclosure under the law.
 

 b.
 

 The second major argument on appeal is that the transcript and response are exempt from disclosure because they contain education records that are protected by the Family Educational Rights and Privacy Act, 20
 
 U.S.C. §
 
 1232g, a law commonly known by its acronym FERPA. We reject this argument, as well.
 

 FERPA applies to all schools that receive federal funds and it serves the dual purpose of ensuring that students will have access to their education records while protecting their rights to privacy by limiting the transferability of their records without their consent. By its terms, FER-PA does not prohibit the disclosure of any educational records. Instead, it operates to deprive an educational institution of its eligibility for federal funding if its policies or practices run afoul of the rights of access and privacy protected by the law.
 

 As it is pertinent here, FERPA is incorporated into Florida law by section 1006.52(1), Florida Statutes (2009), which provides that “[a] student’s education records, as defined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and the federal regulations issued pursuant thereto, and applicant records are confidential and exempt
 
 from s.
 
 119.07(1) and s. 24(a), Art. I of the State Constitution.”
 

 The phrase “education records” is defined in FERPA as follows:
 

 For the purposes of this section, the term “education records” means, except as may be provided otherwise in subpar-agraph (B), those records, files, documents, and other materials which—
 

 (i) contain information directly related to a student; and
 

 (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution.
 

 See
 
 § 20 U.S.C. § 1232g(a)(4)(A).
 

 By the language of this statute, a record qualifies as an education record only if it “directly” relates to a student.
 
 See Ellis v. Cleveland Mun. Sch. Dist.,
 
 309 F.Supp.2d 1019 (N.D.Ohio 2004) (documents, including student witness statements related to discipline of substitute teacher alleged to have improperly administered corporal punishment did not directly relate to students and thus were not “education records”);
 
 see also Briggs v. Bd. of Trustees Columbus State Cmty. Coll.,
 
 2009 WL 2047899 (S.D.Ohio 2009) (records of student complaints against professor relate directly to professor, not students, and are not “education records”);
 
 Wallace v. Cranbrook Educ. Cmty.,
 
 2006 WL 2796135 (E.D.Mich.2006) (holding that statements provided by students in relation to investigation of school employee’s misconduct did not directly relate to students and thus were not “education records” under FERPA);
 
 Baker v. Mitchell-Waters,
 
 160 Ohio App.3d 250, 826 N.E.2d 894 (2005) (records relating to allegations of abuse or neglect of students by teachers are not subject to FERPA).
 

 The trial court concluded that the two documents did not include any information that would qualify as an education record. Specifically, the court found that these documents “do not contain informa
 
 *1211
 
 tion directly relating to a student.” Our review confirms the trial court’s view that these records pertain to allegations of misconduct by the University Athletic Department, and only tangentially relate to the students who benefitted from that misconduct.
 

 The transcript and response would not be protected in any event because they do not reveal the identity of the students. Federal courts have concluded that FER-PA does not prohibit the release of records so long as the student’s identifying information is redacted.
 
 See United States v. Miami Univ.,
 
 294 F.3d 797 (6th Cir.2002);
 
 Ragusa v. Malvern Union Free Sch. Dist.,
 
 549 F.Supp.2d 288 (E.D.N.Y.2008). Likewise, several state courts have recognized that once a record is redacted, it no longer contains “information directly related to a student” and is therefore not an “education record” under FERPA.
 
 See, e.g. Osborn v. Board of Regents of University of Wisconsin System,
 
 254 Wis.2d 266, 647 N.W.2d 158, 168 n. 11 (2002) (“once personally identifiable information is deleted, by definition, a record is no longer an education record since it is no longer directly related to a student”);
 
 Unincorporated Operating Div. of Indiana Newspapers, Inc. v. Trustees of Indiana Univ.,
 
 787 N.E.2d 893 (Ind.App.2003) (materials are not “education records” if student identifying information has been redacted);
 
 see also Bd. of Tr., Cut Bank Pub. Sch. v. Cut Bank Pioneer Press,
 
 337 Mont. 229, 160 P.3d 482 (2007) (FERPA does not prohibit disclosure of records that do not reveal personally identifying information). Because the names of all students were redacted from the transcript and response, we conclude that these documents do not disclose education records as defined in FERPA, and that the documents do not therefore fall within the exemption created by section 1006.52(1), Florida Statutes.
 

 We emphasize that our decision is limited to the disclosure of the redacted versions of the transcript and response. Like the trial court, we have reviewed only the redacted versions of these documents. We are therefore not in a position to decide whether the plaintiffs or other members of the public are entitled to examine the un-redacted versions.
 

 c.
 

 We come now to the final argument on appeal, that the public records law is unconstitutional as applied under the facts of this case. The NCAA contends that the law as applied here violates its rights under the dormant Commerce Clause
 
 [1]
 
 and under the First Amendment right to freedom of association. These arguments lack merit.
 

 The United States Supreme Court has adopted a two-tiered test to determine whether a state law violates the dormant Commerce Clause. If a statute “directly regulates or discriminates against interstate commerce, or [if] its effect is to favor in-state economic interests over out-of-state interests,” the court may declare it unconstitutional as applied, without further inquiry.
 
 Brown-Forman Distillers, Inc. v. New York State Liquor Authority,
 
 476 U.S. 573, 578-79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). However, if the statute regulates evenhandedly and if it has only an indirect effect on interstate com
 
 *1212
 
 merce, the court must determine whether the state’s interest is legitimate and, if so, whether the burden on interstate commerce exceeds the local benefits.
 
 See Dep’t of Revenue of Ky. v. Davis,
 
 553 U.S. 328, 128 S.Ct. 1801, 1817, 170 L.Ed.2d 685 (2008);
 
 Pike v. Bruce Church, Inc.,
 
 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).
 

 The public records law does not attempt to regulate or discriminate against interstate commerce. It does not deal with the subject of commerce at all. Nor does the application of the law in this case favor in-state economic interests over out-of-state interests. The law would apply in the same way we have applied it here if a private Florida corporation doing business entirely within the borders of the state had provided information to a public official and if the information had then been used in connection with public business.
 

 We are not persuaded that the Public Records law has an indirect effect on interstate commerce, but even if some effect had been established, we could not say that the law violates the dormant Commerce Clause. The Public Records law implements a right guaranteed to members of the public under the Florida Constitution and it therefore promotes a state interest of the highest order. The negligible impact the law might have on interstate commerce clearly does not outweigh the goal of ensuring open government.
 

 The NCAA relies on
 
 NCAA v. Miller,
 
 10 F.3d 633 (9th Cir.1993), and
 
 NCAA v. Roberts,
 
 1994 WL 750585 (N.D.Fla.1994), in support of its dormant Commerce Clause argument, but these cases are distinguishable. Both involve state statutes purporting to regulate disciplinary proceedings by college athletic associations. In contrast, the public records law is a law of general application; it does not single out athletic associations.
 

 David Berst, the Vice President for the NCAA’s Division I testified that the NCAA relies heavily on confidential sources and that the organization could not effectively investigate violations of the rules if it could not protect those sources. He said that if the public records law were to apply in a case like this, it would “rip the heart out of the NCAA.” We think that this claim overstates the effect of the law. In fact, the investigation in this very case refutes the claim. The evidence came to the NCAA not from a confidential source who wanted to provide information against the University, but from an internal investigation by the University itself. The transcript of the hearing before the Committee on Infractions does not reveal a single confidential source.
 

 The NCAA’s claim that the application of the Florida public records law would impair its ability to function also assumes that the law imposes a burden that would not be imposed in other states. That is not the case. Many other states also define a public record broadly to include records that are connected with the business of the government yet are not in the hands of a public agent. Some statutes are like the one in Florida, in that they refer to documents that were made or “received” by a public agent in connection with public business.
 
 [2]
 
 Others are even
 
 *1213
 
 broader, in that they refer to documents that were “used” by a public agent in the course of public business.
 
 [3]
 
 We do not
 
 *1214
 
 suggest that the analysis would be precisely the same in every state, but merely that Florida law is not so distinctive that it would force the NCAA to change the way it does business. This case arose in Florida, but it is likely that the NCAA would be dealing with the same issue had it arisen most anywhere in the United States.
 

 The argument that the application of the Florida public records law violates the NCAA’s right to freedom of association under the First Amendment is also unavailing. We acknowledge that the NCAA is a private voluntary organization and that it enjoys the freedom of association guaranteed by the First Amendment, but the NCAA has not shown that the application of the Florida public records law impairs that right.
 

 In support of its argument on this point, the NCAA cites
 
 Boy Scouts of America v. Dale,
 
 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000), but that case dealt with a statute that directly impaired associational rights. The court held that the Boy Scouts could not be forced by state law to accept within its membership an openly homosexual boy. The situation presented here is a far cry from the one presented in the
 
 Dale
 
 case. The application of the Florida public records law could not, by any stretch of the imagination, require the NCAA to admit or reject certain institutions. Nor does it require the NCAA to reject the values it wishes to express. The law may prevent the NCAA from conducting secret proceedings against a public school in this state, but that does not impair the NCAA’s freedom of expression or its freedom of association.
 

 III.
 

 In summary, we hold that the application of the Florida public records law does not violate any constitutional right under the facts of this case, that the transcript of the hearing before the Committee on Infractions and the Committee’s response are public records, and that these documents are not exempt from disclosure under state or federal law. For these reasons, we affirm the judgment of the trial court and order the disclosure of the transcript, as redacted by agreement of the parties, and the response in its original form, with the redactions agreed to by the parties.
 

 Affirmed.
 

 WEBSTER and CLARK, JJ., concur.
 

 [1]
 

 . The Commerce Clause states: "The Congress shall have Power ... To regulate Commerce ... among the several States....” U.S. Const., Art. 1, § 8, cl. 3. The United States Supreme Court has recognized that this affirmative grant of authority to Congress also encompasses an implicit or "dormant” limitation on the authority of the States to enact legislation affecting interstate commerce.
 
 See Hughes v. Oklahoma,
 
 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979).
 

 [2]
 

 . For example, Alabama includes records "made
 
 or received
 
 ... in die transaction of public business,”
 
 see
 
 § 41-13-1, Ala.Code 2009; alaska includes any records "that are developed
 
 or received
 
 by a public agency, or by a private contractor for a public agency,"
 
 see
 
 AS 40.25.220(3); Arizona includes records "made
 
 or received
 
 by any governmental agency in pursuance of law or in connection with the transaction of public business,”
 
 see
 
 A.R.S. § 41-1350 (2009); Arkansas expanded its Freedom of Information Act to include rec
 
 *1213
 
 ords that are received by a public agency,
 
 see Arkansas Department of Fin. & Admin. v. Pharmacy Assoc. Inc.,
 
 333 Ark. 451, 970 S.W.2d 217 (1998); Georgia includes, among other things, "computer based or generated information, or similar material prepared and maintained
 
 or received
 
 in the course of the operation of a public office or agency,”
 
 see
 
 OCGA § 50-18-70(a); indiana includes any record that is "created,
 
 received,
 
 retained, maintained by a public agency ... regardless of its form or characteristics” in Ind.Code § 5-14-3-2(n); Illinois will include records that are "created,
 
 received,
 
 retained [or] maintained” by a public agency,
 
 see
 
 5 ILCS 140/2 (West 2010); Maryland includes records "made by ...
 
 or received
 
 by the unit or instrumentality in connection with the transaction of public business,”
 
 see
 
 MD Code § 10-611(g)(1) (2009); Massachusetts includes "documentary materials or data, regardless of physical form or characteristics, made
 
 or received
 
 by any officer or employee of any agency,”
 
 see
 
 M.G.L.A. c. 4, § 1; Minnesota considers public records to be "government data,” which is defined in the statute as "all data collected, created,
 
 received,
 
 maintained or disseminated by any government entity regardless of its physical form,”
 
 see
 
 Minn.Stat. § 13.02(7); north Carolina defines public records as "all documents ... made
 
 or received
 
 pursuant to law or ordinance in connection with the transaction of public business,”
 
 see
 
 N.C.G.S. § 132-l(a) (2009); Oklahoma includes public records "created by,
 
 received
 
 by, [or] under the authority of ... public officials, public bodies, or their representatives in connection with the transaction of public business,”
 
 see
 
 51 Okl.St.Ann. § 24A.3; Rhode island includes "all documents ... made
 
 or received
 
 pursuant to law or ordinance or in connection with the transaction of official business by any agency,”
 
 see
 
 R.I. Gen. Laws § 38-2-2; Texas includes "information that is
 
 collected,
 
 assembled, or maintained under a law or ordinance or in connection with the transaction of official business,”
 
 see
 
 Tex. Gov't Code Ann. § 552.002(a) (Vernon 2009); Vermont includes "documents ... that are produced
 
 or acquired
 
 in the course of agency business,” see 1 V.S.A. § 317(b); and Wyoming includes records "that have been made by the state of Wyoming
 
 ... or received
 
 by them in connection with the transaction of public business,” see § Wyo. Stat. Ann. § 16-4-201(a)(v). (emphasis supplied in all citations)
 

 [3]
 

 . Among these states, california includes records relating to the conduct of the public's business that are "prepared, owned,
 
 used,
 
 or retained by a public agency regardless of its form or characteristics,”
 
 see
 
 Calif. Govt.Code § 6252(e); Connecticut includes "any recorded data or information relating to the conduct of the public’s business prepared, owned,
 
 used,
 
 received or retained by a public agency,”
 
 see
 
 Conn. Gen.Stat. § 1-200 (2009); Delaware includes records of "information of any kind, owned, made,
 
 used,
 
 retained, received, produced, composed, drafted or otherwise compiled or collected, by any public body,”
 
 see
 
 Del. Tit. 29, § 10002(g); idaho includes records "relating to the conduct or administration of the public's business prepared, owned,
 
 used
 
 or retained by a public agency,”
 
 see
 
 Idaho Code Ann. § 9 — 337(13); Kentucky includes records that are "prepared, owned,
 
 used,
 
 in the possession of or retained by a public agency,”
 
 see
 
 Ky. Stat. Ann. § 61.870(2) (2009); Louisiana includes, among other things, "information contained in electronic data processing equipment,
 
 having been used”
 
 by a public agent in the course of a public duty,
 
 see
 
 La. Stat. Ann. § 44:l(2)(a) (2009); Maine includes records that "[have] been
 
 received or prepared for use
 
 in connection with the transaction of public or governmental business,” Me.Rev.Stal. Ann., Tit. 1, § 401 (2009); Michigan includes records "prepared, owned,
 
 used,
 
 in the possession of, or retained by a public body in the performance of an official function,”
 
 see
 
 Mich. Comp. Laws Ann. § 15.232(e); new Mexico considers "[a]ll documents, ... that are
 
 used,
 
 created, received, maintained or held by or on behalf of any public body and relate to public business, whether or not the records are required by law to be created or maintained” to be public records,
 
 see
 
 N.M. Stat. Ann. § 14-2-6(E) (2009); new york expanded its definition of "public record,” in a case in which the Appellate Court of New York held that "[t]he statutory definition of 'record' makes nothing turn on the purpose for which a document was produced or the function to which it relates .... Nor is it relevant that the documents originated outside the government .... ”
 
 see Matter of Washington Post Co. v. Ins. Dep’t,
 
 61 N.Y.2d 557, 565, 475 N.Y.S.2d 263, 463 N.E.2d 604 (N.Y.1984); Oregon defines a public record as “any writing that contains infor
 
 *1214
 
 mation relating to the conduct of the public’s business ... prepared, owned,
 
 used
 
 or retained by a public body regardless of physical form or characteristics,”
 
 see
 
 Ore.Rev.Stat. § 192.410 (2005); south Carolina includes records that are "prepared, owned,
 
 used,
 
 in the possession of or retained by a public body,”
 
 see
 
 S.C.Code Ann. § 30-4-20(0 (2002); and Washington includes public records that "re-lat[e] to the conduct of government ... prepared, owned,
 
 used,
 
 or retained by any state or local agency”
 
 see
 
 Wash. Rev.Code § 42.17.020(42) (2008). (emphasis supplied in all citations)